## CIRCUIT COURT OF THE CITY OF ROANOKE

Shaio Hon Yang Yeh

v.

Guang Huei Yeh

September 24, 2001

Case No. CH97-997

BY JUDGE ROBERT P. DOHERTY, JR.

The parties ended their twenty-three year marriage with a no-fault divorce in August 1998, reserving their rights to equitable distribution. When they separated, they owned three pieces of commercial real estate on which they operated or leased restaurants. They also owned two pieces of residential real estate. Ready cash for their living and operating expenses, as well as for the acquisition and maintenance of their commercial real estate, was frequently obtained through loans and through the injudicious use of credit cards. Joint credit card debt increased after separation amid allegations of fraud. The parties agree that with the exception of a few items of separate property, the majority of which has been divided to the satisfaction of each party, the balance of their assets and most of their debts are marital. Spousal support is not requested by either party and minor children are not involved. Through a comedy of errors and misfortunes as alleged by one side, or through maliciousness as alleged by the other, the note payments were not made on certain parcels of real estate causing foreclosure proceedings to commence. Injunctive relief prevented the foreclosures, and a reserve auction was held resulting in a realization of cash proceeds. Throughout the entirety of this case, the husband, claiming a lack of understanding, was routinely uncooperative. He constantly ignored the rulings of the Court. He delayed the proceedings by

failing to provide discovery information as requested. After having voluntarily assumed the obligation to make note payments, he failed to do so. He now claims that despite an agreement to transfer an heirloom ring to the wife, he no longer has it in his possession.

## Considerations

In making each of its decisions in this case, the Court has carefully reviewed all of the evidence presented, as well as the oral and written arguments of counsel. It has had the opportunity to observe the parties and to judge their credibility. Where testimony was in conflict, in the majority of instances, the Court chose to believe the Wife over the Husband. All of the cases and code sections bearing on the questions presented in this case have been considered, especially those factors set forth in § 20-107.3(E), Code of Virginia (1950), as amended.

### Classification of Marital Property
### and Division of Separate Property

The Court finds that except for the ring that belonged to the Wife's father, all of the rest of the real and personal property that was disclosed to the Court is marital property. It was all acquired by the joint efforts of both parties, with the intent that they each would receive a one half undivided interest in it. The ring is the separate property of the Wife. Husband and Wife agreed that the Husband would deliver it to the Wife in return for the assignment to the Husband of certain motor vehicles and all of the personal property located at 4580 Oakland Boulevard in the City of Roanoke. Their agreement included that the Husband would receive their former marital residence as a portion of his share of the marital assets. The Husband, having earlier indicated that the ring was in his possession and having been directed by the Court to deliver it to the Wife, is now held in contempt of Court for not having made delivery and for having taken whatever steps he did to divest himself of its possession. He is sentenced to an indeterminate term of incarceration in the Roanoke City Jail until such time he purges himself of this contempt. He shall report to the jail on October 5, 2001, at 6:00 p.m. Failure to report to jail at the time designated will result in a capias being issued for his arrest. If he delivers the ring prior to the starting time of his jail sentence, he will still have to report to the jail at the time designated unless and until an order, endorsed by counsel for both parties, has been entered relieving him of the jail sentence. The deed to the real estate on Oakland Boulevard, Husband's share of the China Gate

restaurant, and his share of the cash proceeds of the sale of the commercial real estate shall not be released to him until after an order purging him of contempt has been entered.

## Marital Personal Property Division

The parties did not present evidence of the value of the motor vehicles retained by Husband, of the household furnishings located at 4580 Oakland Boulevard, or of their one-half interest in the restaurant equipment located at the former China Gate Restaurant. As per agreement, the motor vehicles and personal property at 4580 Oakland Boulevard shall be assigned to the Husband. The restaurant equipment belongs equally to both Husband and Wife and shall be treated as part of the real estate at the China Gate Restaurant. It will be divided in kind along with the real estate. The parties had life insurance policies, the total cash values of which were $20,602.00. Husband appropriated those funds as his own. One-half of that money, or $10,301.00, will be credited to the Wife.

## Marital Real Estate

The parties owned five parcels of marital real estate when they separated. Three of these were commercial properties and two were residential real estate, one being their former marital residence. The evidence of their values, loan balances, delinquent taxes, and equity shortly after their separation was as follows:

| Real Estate | Value | Loan Balance | Del. Tax | Equity |
|---|---|---|---|---|
| 4115 Melrose Taipei Restaurant | 155,000 | 26,344.33 | 1,600 | 127,055.67 |
| 1334 Wmson Rd. China Gate Value reflects 50% interest of parties | 115,000 | 0 | 3,190.98 | 111,809.02 |
| 5610 Wmson Rd. Kings Buffet | 360,000 | 43,315.80 | 13,989.86 | 302,694.34 |

| | | | | |
|---|---|---|---|---|
| 3411 Westside Blvd. | 57,000 | 0 | 817.94 | 56,182.06 |
| 4580 Oakland Blvd. | 90,000 | 89,728.47 | 0 | 0 |
| TOTAL | | | | 597,741.09 |

Since that time, three of the parcels were sold at a reserve public auction for less than their appraised value. The proceeds realized amounted to $234,701.34. Wife argues that Husband should bear the burden of the diminished value of the three auctioned properties because the auction was forced on them by his intentional refusal to make the note payments. She treats his actions as though he purposely tried to sabotage their assets.

*Fair Market Value*

The actual question before the Court is what is the fair market value of the auctioned pieces of real estate. "In many sales at auction, there is present an element of legal compulsion which negates the idea of a free and voluntary transaction and which rebuts the probability that fair market value has been paid and received. . . . [H]owever, there are other sales at auction where the element of compulsion is lacking. In a given case, it might be shown that the circumstances under which the property was sold were free and open and produced a sale price reflecting [fair] market value." *Tremblay v. State Hwy. Comm'r*, 212 Va. 166, 168 (1971). Such is the case here.

The Court enjoined a forced foreclosure in order to stop a potential sale for less than fair value. Thereafter the Court appointed the lawyers for the parties as well as the lawyer for the foreclosing bank as Special Commissioners to sell the property at a reserve auction. An advertising budget was set. The auction was diligently and heavily advertised, and a private auction company printed and distributed brochures to potential bidders. The auction was well attended. Seventy-two registered bidders appeared and took part, many of whom had made appointments in advance with the auction company to view and inspect the various properties. The actual sale was conducted by a professional auctioneer on site, rather than on the courthouse steps by a lawyer or bank trustee. The bidding was spirited and each parcel was knocked down to the highest bidder. It was a properly held public sale with no irregularities, unfairness, fraud, coercion, or collusion. The sales prices were not grossly inadequate nor did they shock the conscious of the Court. The parties did not file any motions or objections to the bids received,

although Husband did object to the Court's refusal to accept an upset bid on one of the parcels.

Prior to making its decision to confirm the sales, the Court was mindful that the parties had struggled to sell these properties since the inception of their separation in 1997. Listing agreements were tendered and refused. All of the problems that can develop when properties are offered for sale with commercial real estate agents occurred. Although some of the properties were listed at or near their appraised values, no sales occurred. Having considered the entire history of these properties, including the circumstances leading to their sale, the Court previously found "that the public sale held on January 8, 2001, was properly and fairly conducted and was well attended by potential bidders, that the bidding was spirited and the sale produced a fair price. . . ." The sale was confirmed. The Court now finds the evidence to be that the properties knocked down at the auction sold for their fair market value.

The fair market value of all of the marital real estate is as follows:

| | |
|---|---|
| Taipei Restaurant | $131,250.00 |
| King's Buffet | $194,250.00 |
| China Gate (50% interest) | $115,000.00 |
| 3411 Westside Blvd. (Residence) | $ 45,150.00 |
| 4580 Oakland Blvd. (Residence) | $ 90,000.00 |
| TOTAL | $575,650 |

*Rents, Profits, and Note Payments*

From the date of the separation and until a divorce decree was entered, Husband collected rents on the various properties. He also had exclusive use of the former marital residence. After the parties were divorced in August of 1998, Husband continued to collect the rents and profits from the various properties and continued to have exclusive use of the former marital residence. He also made the monthly note payments on the Taipei Restaurant, the King's

Buffet Restaurant, and the former marital residence until May 2000, when he ceased making the monthly note payments on the commercial properties but not on the house in which he lived. No notice was given to the Wife that he had stopped making monthly note payments. Despite the fact that he was no longer making note payments on the commercial properties, he still collected all of the rents and profits that were generated until two months prior to the Court ordered sale. At that time the Special Commissioners collected two rental payments from one of the commercial properties in the total amount of $3,600.00.

There is a question as to how much rents and profits were received from the various properties on a monthly basis. That question exists because Husband would not divulge that information satisfactorily in discovery or in ore tenus testimony. He continually tried to hide behind a language barrier, which the Court finds as a matter of fact, did not and does not exist. He was stubbornly evasive, and he denied that more than one of the properties were rented, although satisfactory evidence as to the occupancy of at least one additional parcel of real estate was presented. The Husband generally tried, and was successful, in frustrating the discovery process concerning his receipt of rents and profits. After he ceased making the note payments, he in fact collected $14,400.00 in rents from the Taipei Restaurant, which he kept as his own. He collected the rent from the residential real estate on Westside Boulevard, for which he refused to account. The information he provided on the uses and/or profits received on the King's Buffet Restaurant was less than credible.

The Court had advised the Husband on numerous occasions, directly and through counsel, that failure to cooperate as directed could result in sanctions being imposed, portions of his evidence being struck or ignored, and equitable principles being brought to bear that would level the playing field. Notwithstanding the above, the Husband continued his passive aggressive behavior with the intent to unfairly increase his profits in the equitable distribution of assets and debts. His actions are akin to embezzlement. He appears before this Court without clean hands.

The Court therefore finds, that except for the marital residence, the rents and profits from all of the parcels of real estate were sufficient to pay the monthly note payments and delinquent taxes on all of the real estate. The Husband having been solely in control of those funds and having voluntarily assumed the duty to pay those periodic real estate debts is solely responsible for them. Although the ownership changed from tenants by the entireties to a tenancy in common when the divorce decree was entered, in accordance with § 20-111, Code of Virginia (1950), as amended, the equitable principles

remain the same. Section 8.01-31 requires an accounting in equity against one receiving more than his just share. That accounting and its contemplated fair distribution is what is being accomplished in this case. The Court will treat the $14,400.00 in excess rent from the Taipei Restaurant and the two monthly rental payments received by the Special Commissioners as a portion of Husband's share of the marital assets. The Court charges against Husband's share of the marital assets all unpaid note payments and the delinquent taxes on the real estate, their late payments and related costs. The Court finds that the rents and profits received by and attributed to the Husband, when added to the two months rents received by the Special Commissioners, exactly equals the delinquent taxes and the arrearages on the several real estate notes prior to the sale of the property.

The note arrearages prior to sale of the real estate were $17,823.15. The figures were stipulated in the hearings involving the attorney who handled the foreclosure for the bank, although for some reason they were not reduced to writing or made an exhibit at that time. Accordingly, the Court reacquired the loan arrearage figures from the bank's lawyer while drafting this letter opinion. The delinquent real estate taxes were $19,598.78.

### Marital Residence

The Wife repeatedly requested that the Husband be held accountable for his exclusive use of the marital residence. Prior to their divorce that residence was held by them as tenants by the entireties. The common law has not been changed in Virginia concerning the fact of law that there is no duty of accounting or reimbursement by a joint owner for receiving more than his or her just share of the use of tenants by the entireties real estate. *Cole v. Cole*, 27 Va. Cir. 225 (1992). Section 8.01-31 has changed the common law as to all other forms of joint ownership. "Upon the parties divorce, their marital home, which they had owned as tenants by the entirety, became their property as tenants in common, Code § 20-111, and thus fell within the scope of this [§ 8.01-31] statute." *Gaynor v. Hird*, 15 Va. App. 379, 381 (1992). Husband is accountable to the Wife for one-half of the fair rental value of the marital residence from the entry of the final divorce decree through the date of the entry of the decree of equitable distribution. However, there is no evidence as to the fair rental value of the former marital residence. The Wife will not therefore prevail on this point. See *Bowers v. Bowers*, 4 Va. App. 610, 617 (1987). The Husband is not ordered to reimburse the Wife for his exclusive use of the marital residence. Likewise there is no evidence of the monthly note

payment on that piece of real estate, so Wife is not ordered to reimburse any portion of those payments to the Husband.

## Marital Debt

All of the debt the parties had incurred at the time of their separation was marital debt. That included all of the secured loans on their marital real estate, even the one obtained shortly after their separation. That secured debt totaled $159,388.60. They also had debt in the amount of $71,979.42 in eleven credit cards titled in the name of the Husband, $48,467.75 in nine credit cards titled in the name of the Wife, $14,988.43 in two joint credit cards, $18,531.65 in two G.E. Capital Consumer credit cards, which may or may not be titled solely in the name of the wife, and $18,093.00 owed to the Wife's brother. They also owed $19,598.78 in delinquent real estate taxes. Their total marital debt was $351,047.63.

The Court finds that the majority of Husband's evidence of credit card debt is not correct. He lists some credit cards as having marital debt that either did not exist at or near the time of separation or did not have a balance at that time. His allegation that he used some of these funds to diminish marital debt, both secured and unsecured, may be correct insofar as the actual application of the credit card proceeds are concerned. However, money is fungible. Recognizing that the Husband has not been gainfully employed during the pendency of this divorce case but that he has made payments on both real and personal property debts as well as his living expenses out of miscellaneous marital funds coming his way, the Court has discounted his claimed credits drastically.

The figures for credit card debt were found by accepting the evidence of the list of credit card debt balances as set forth in the Wife's schedule entitled "Debt Reduction," which was attached to her "Revised Brief of Plaintiff." To those figures were added two G.E. Capital Consumer credit cards with a combined total debt of $18,531.65. The total of credit card debts was $153,967.25. All of the payments on the credit card debt were made by the Husband. The evidence of payments and increases in credit card debt was contradictory, conflicting, and sufficiently confusing enough to cause a change of careers by many CPA's. In the final analysis the most accurate approach to these debts is to simply deduct from the entire credit card total the $90,000.00 borrowed by the parties for that debt reduction. "[E]quity treats as done what ought to be done. . . ." *Campbell v. Corpening*, 230 Va. 45, 49 (1985). Husband will be treated as if he paid that $90,000.00 on the credit card debt. In fact, Husband paid approximately $33,883.43 of those borrowed funds onto

the credit card debt and kept the remaining $56,116.57 as his own. Therefore, the outstanding credit card debt is fixed at $63,967.25. When coupled with the $18,093.00 debt owed to the Wife's brother, the total unsecured debt balance at this time is $82,060.25.

## Marital Debt Summary

All secured debts and delinquent taxes, except for the debt on the former marital residence, were paid in full upon the sale of the three parcels of real estate. After applying the $90,000.00 loan proceeds against the credit card debt, it is reduced to $63,967.25. An $18,093.00 unsecured debt is owed to the Wife's brother. The balance of the $90,000.00 secured loan against the former marital residence still exists.

## Attorney's Fees

Both parties have requested attorney's fees from the other, or in the alternative, the Husband has suggested that each party be responsible for his or her own attorney's fees. The Husband's actions and behavior have caused this case to go on for years longer than it should have. He has actively frustrated discovery and presentation of evidence and been less than forthright in his testimony. The Court finds it appropriate and equitable under all of the circumstances of this case that the Husband bear the entire cost of the Wife's attorney's fees in the amount of $15,938.00. That cost of litigation will be deducted from the Husband's share of the equitable distribution proceeds and paid directly to the Wife's lawyer.

## Equitable Distribution and Monetary Award

"Virginia's statutory scheme of equitable distribution does not have a presumption favoring an equal distribution of assets." See *Papuchis v. Papuchis*, 2 Va. App. 130, 132, 133 (1986). Notwithstanding that lack of statutory presumption, the Court has previously found that it was the intent of the parties that each would equally share in their assets and debts. In an attempt to place the parties in equipoise as of the time of their separation, or at least shortly thereafter, and in accordance with the findings previously made, the Court distributes the assets and debts of the parties as follows. Husband shall receive title to the former joint marital residence of the parties and be solely responsible for its secured debt. He will also receive the entire marital interest in the China Gate Restaurant and the sum of $41,544.18. From

that cash payment will be deducted $15,938.00 owed to the Wife's attorney, leaving him a balance of $25,606.18. Wife shall receive $202,157.16 in cash. In addition she shall be responsible for the $18,093.00 owed to her brother and the $18,531.65 debt in her own name for the two G.E. Capital Credit Company credit cards. Husband shall be solely responsible for all of the remaining marital debt.

Both parties are ordered to not only pay the debts assigned to them, but to indemnify and hold harmless the other for any and all claims made against such non-responsible party by the creditor. In addition, Husband shall, within 120 days of his release from jail or the entry of the final decree in this case, whichever is later, have caused the complete release of the Wife from the underlying secured debt on the former marital residence, either by negotiation with the creditor or by refinancing. Wife shall, within the same time frame, sign deeds prepared by the Husband, conveying her undivided interests in the two remaining parcels of real estate unto the Husband. Because of the inability to guarantee the Husband's compliance with any directive of the Court, those deeds and the Husband's share of the cash proceeds will be retained in the possession of the Wife's attorney and not delivered unto the Husband until satisfactory proof is presented that Wife's obligation under the secured debt has been released.