## Richmond

ROBERT L. LEONARD, ET AL.

v.

H. LYMAN COUNTS

November 26, 1980.

Record No. 781558.

Present: All the Justices.

*Dennis L. Godfrey; Dennis E. Jones* (*Jones & Godfrey,* on brief), for appellants.

*Charles E. Schelin* (*Browning, Morefield, Schelin, Cody and Ar-rington, P.C.,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

H. Lyman Counts filed a bill of complaint in the trial court against Robert L. Leonard and Betty J. Leonard, his wife, to establish a constructive trust in a parcel of land and to require the Leonards to convey the parcel to him. After hearing the evidence *ore tenus,* the chancellor ruled that the Leonards held the parcel as constructive trustees for Counts, and by final decree entered August 1, 1978, ordered them to deliver a deed conveying title to him. On appeal, the Leonards contend that the chancellor's ruling is not supported by the clear and convincing evidence required to establish a constructive trust.

Counts alleged in the bill that he and Robert L. Leonard had agreed that Leonard would bid for both of them on a tract of land being offered for sale at auction. If their bid was accepted, they would jointly acquire title to the land and partition it along a boundary line which they had agreed upon and which would be established by survey, with a 40-foot easement of right-of-way provided for the benefit of the Counts parcel over the Leonard land to the public road. Counts further alleged that contrary to their agreement Leonard had the entire tract conveyed to himself and his wife, and that subsequently Leonard tendered a deed purporting to convey the parcel to Counts subject to material variations from the terms of the agreement. The deed described the width of the easement of right-of-way as 30 feet rather than 40 feet, and included restrictions that Counts alleged would unreasonably limit his use of the land.[1]

In an opinion rendered on July 20, 1978, the chancellor ruled that Counts and Leonard had agreed to purchase the property jointly, had agreed upon the boundary line between the two parcels, and had agreed upon the sum of $41,667 as the purchase price to be paid by Counts. Finding the evidence insufficient, however, to show an agreement that the right-of-way should be 40 feet wide, the chancellor ruled that the 30-foot easement included in the proffered deed was proper. Finally, the chancellor ruled that the restrictions, which he described as "the most restrictive" he had ever read in a deed, were unreasonable, were not a part of the negotiated agreement, and could not properly be inserted after agreement had been reached. Accordingly, the final decree provided for delivery of a deed to Counts identical in all respects to the deed previously submitted by the Leonards except for

---

[1] The restrictive covenant provided as follows:

...the above described lands shall not be sub-divided for the purposes of building residential homes or apartment complex, campgrounds, hotels, motels, industry or commercial use, said covenant to be made covenant with said land.

deletion of the restrictions and reversal of the calls in the metes and bounds description of the Counts parcel to correct what the parties agreed was an obvious clerical error.

Counts testified that he attended the auction sale of the H. H. Cassell property on October 1, 1977. He and others, including Leonard, made bids, until Counts suggested to Leonard that, as Leonard was interested in the residence and the front portion of the tract along the highway, and Counts was interested in the back portion, they agree upon a division of the property and discontinue their competitive bidding. Leonard and Counts agreed tentatively on the maximum bid to be made, the percentage to be paid by Counts, and the boundary line between the parcels that each was to acquire. Counts then took no further part in the auction and Leonard continued to bid until his last offer of $125,000 was accepted. Either Counts or Leonard, or both, informed the auctioneer's agent that they were joint purchasers of the property, and, as directed by the agent, Counts signed in Leonard's presence the purchase agreement which Leonard had already signed. Leonard said that he would come to Counts's office on the following Monday to take care of the details, but he did not appear on either Monday or Tuesday.

After the day of the sale, Counts informed H. H. Cassell of his interest in the property. They went over the portion that Counts was to acquire, and Cassell, after explaining how to drain the pond and water lines and where to find paint to complete the painting of the barn roof, gave Counts a key to the gate.

Later in the week, according to Counts, he went to the property and found Leonard there. Leonard complained that his wife was unhappy because he had agreed to let Counts have part of the land. On this occasion, in discussing a right-of-way from the back parcel over the front parcel to the public road, Leonard said that he would have a surveyor stake it out 20 feet on each side of a centerline. Contrary to their agreement, whereby Counts would pay 25% of the purchase price, Leonard insisted that Counts pay one-third. To avoid further misunderstanding, Counts wrote out and Leonard signed a memorandum dated October 6, 1977, describing the boundary line between the parcels, at the end of which were these words:

"Agreed Price of $41,667. Terms to be agreed on at later date."

A fence was erected on the boundary line after it had been established by the surveyor. Counts did not know who built the fence and he did not pay any of the expense of construction.

Counts testified that it was his understanding that each would pay his agreed share of the purchase price to the landowner and receive a deed for his parcel. No restrictions on the use of the land had been suggested until Leonard came to see Counts one day, informed him that the deeds were "almost ready", and asked if he would agree to a provision in his deed prohibiting subdivision of his parcel for five years. Counts declined. On October 27, 1977, when Leonard tendered the deed with restrictions, Counts realized that title to the entire property had been acquired by Leonard, and that he would not receive a deed from the Cassells for the rear portion.

Joy Crookshank, the auctioneer's agent who was present at the sale, testified as a witness for Counts. She identified the purchase agreement signed by Leonard and the landowner, H. H. Cassell, at the conclusion of the auction, when Leonard's bid of $125,000 for 49.3 acres, including the house and the barn, was accepted. She wrote into the agreement, as Leonard directed, that the deed should be made to him and his wife, jointly with right of survivorship. Counts was not present at that time, but shortly thereafter he explained to her in Leonard's presence that he and Leonard had bought the property together and Leonard was to sell him a portion of it. Counts asked where he could sign the agreement, and she had him sign it in the margin beside Leonard's signature. Leonard delivered to Mrs. Crookshank his check for the down payment; Counts was not asked to pay any money, and did not do so.

H. H. Cassell testified that he understood that the Leonards were the sole purchasers, because they made the down payment and executed the deed of trust securing the deferred purchase money. After the day of the auction, at Counts's instigation, Cassell went over the farm with him, explained how to winterize the water system, and told him where there was paint to use on the barn roof. Cassell gave Counts a key to the gate; when he informed Leonard of this action, Leonard made no response. Before executing the deed to the Leonards, Cassell casually mentioned to Leonard that Counts was claiming part of the property, and Leonard replied affirmatively.

Leonard denied being present when Counts signed the auctioneer's purchase agreement. He admitted signing the memorandum dated October 6, 1977. He denied that there was any agreement on the day of the sale as to what land Counts was to get or what he would pay. On October 6, they agreed on the boundary line. Leonard conceded that there was no discussion of restrictions but indicated that the reference to "[t]erms to be agreed on at later date" meant that

terms would be discussed with his wife before final approval. He and his wife decided the same day that there must be restrictions imposed upon the Counts parcel, and they set these forth in the deed that they tendered him.

Leonard's wife testified that she worked in her husband's business and that they always acquired property jointly. She did not know of Counts's interest in the rear parcel until several days after the sale, when she and her husband agreed that he could have it for about $45,000 subject to restrictions. They subsequently agreed to let Counts acquire the parcel for a lower price.

Early in the hearing in the trial court, the chancellor stated the issue to be whether Counts and Leonard had agreed on the day of the sale "that only one would bid and the property would be divided". If such an agreement was made, the chancellor said, then Leonard "would hold in trust for Lyman Counts the portion so proved in the oral agreement", on the theory that the agreement created an oral trust, resulting trust or constructive trust. The chancellor, who heard the evidence *ore tenus,* found that there was such an agreement between Counts and Leonard and held that the agreement gave rise to a constructive trust.

■■■ The evidence supports the finding of fact and ruling of law made by the chancellor. In Virginia, an agreement which is the basis of a constructive trust may be proven by parol evidence and does not violate the statute of frauds.[2] *Horne* v. *Holley,* 167 Va. 234, 240, 188 S.E. 169, 172 (1936).

Counts's testimony as to his conversation with Leonard during the sale, his discontinuance of bidding, the testimony of Counts and Crookshank as to the circumstances under which Counts asserted in Leonard's presence an interest in the purchase and signed the contract of sale, the testimony of Counts and Cassell that they viewed together the rear parcel, discussed the care and upkeep of the property, and that Cassell delivered to Counts a key to a farm gate, and Cassell's testimony as to Leonard's reaction when informed that Counts had received the key and was claiming an interest in the land, are sufficient to establish an agreement for a joint bid and a joint purchase of the Cassell land. There was agreement as to the location of the boundary line between the parcel to be acquired by Leonard and the parcel to be acquired by Counts. Other details not finally settled on the date

---

[2] Express and resulting trusts may also be proved by parol evidence. *Peal* v. *Luther,* 199 Va. 35, 37, 97 S.E.2d 668, 669-670 (1957) (express trust); *Salyer* v. *Salyer,* 216 Va. 521, 525, 219 S.E.2d 889, 893 (1975) (resulting trust).

of sale were subsequently agreed to—the price to be paid by Counts, and the terms of payment.

Without notifying Counts, Leonard closed the purchase with the Cassells, obtaining a deed conveying title to the entire tract to himself and his wife, as tenants by the entirety, with right of survivorship, and securing the deferred purchase money. This deed from H. H. Cassell and wife, dated October 6, 1977, acknowledged October 12, 1977, and recorded on that date, contained no restrictions. The deed executed by Leonard and his wife, dated October 27, 1977, purporting to convey the rear parcel to Counts, described the width of the easement for the benefit of that parcel as 30 feet rather than the 40 feet claimed by Counts, and included restrictions that had never been discussed with Counts or agreed to by him.

There are distinctions between express, resulting, and constructive trusts. An express trust is based on the declared intention of the trustor. A resulting trust is based on a presumed intent or inference of law from the circumstances. *Peal* v. *Luther,* 199 Va. 35, 37, 97 S.E.2d 668, 669 (1957).

Resulting and constructive trusts comprise two categories of trusts by operation of law arising without any express declaration of trust. *See* 1 *Minor on Real Property* § 451 at 603 (2d ed. F. Ribble 1928). Thus, a resulting trust arises when one person pays for property, or assumes payment of all or part of the purchase money, but has title conveyed to another with no mention of a trust in the conveyance. *Salyer* v. *Salyer,* 216 Va. 521, 526, 219 S.E.2d 889, 893 (1975); *see also Muth* v. *Gamble,* 216 Va. 436, 439, 219 S.E.2d 894, 896-97 (1975); *Kellow* v. *Bumgardner,* 196 Va. 247, 253, 83 S.E.2d 391, 395 (1954); *Williams* v. *Powers,* 168 Va. 111, 115, 190 S.E. 149, 150 (1937). Although a subsequent payment of, or promise to pay, the purchase price will not create a resulting trust, such a trust arises when prior to the purchase one person binds himself to pay purchase money and stands behind his commitment, but title is conveyed to another. A. Scott, *The Law of Trusts,* §§ 456.2, 457 at 3393-95 (3d ed. 1967); Restatement (Second) of Trusts § 456e, Illus. 6 (1957). This case might have been decided, therefore, on the theory of a purchase-money resulting trust. However, the bill of complaint sought to establish a constructive trust, the case was tried on that theory, and the chancellor ruled accordingly. We will consider it on the same basis.

Constructive trusts are those which the law creates, independently of the intention of the parties, to prevent fraud or injustice.

*Porter* v. *Shaffer*, 147 Va. 921, 928, 133 S.E. 614, 616 (1926). While there is a distinction between resulting and constructive trusts, albeit often difficult to determine, the same remedial principles apply to both. *Id*. at 928-29, 133 S.E. at 616. Constructive trusts have also been defined more comprehensively as follows:

> "Constructive trusts arise, *independently of the intention* of the parties, *by construction of law;* being *fastened upon the conscience* of him who has the legal estate, in order to prevent what otherwise *would be a fraud*. They occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit."

1 *Minor on Real Property* § 462 at 616 (2d ed. Ribble 1928).

The parol evidence required to prove a resulting or constructive trust must be clear and convincing, *i.e.,* more than a mere preponderance. *Salyer*, 216 Va. at 525, 219 S.E.2d at 893 (resulting trust); *Sutton* v. *Sutton*, 194 Va. 179, 185, 72 S.E.2d 275, 278 (1952) (constructive trust).

Two cases illustrate the kinds of agreements that give rise to constructive trusts. In *Horne* v. *Holley,* 167 Va. 234, 188 S.E. 169 (1936), there was an oral agreement between Horne and Holley to make a joint purchase of certain assets, including real estate. Horne, however, purchased the assets in the name of a corporation, of which he was president, a director, and majority stockholder. We affirmed the ruling of the trial court that Horne and the corporation were constructive trustees holding the property for the joint benefit of Horne and Holley. We noted that the corporation, through Horne, its president, had knowledge of the confidential relation existing between Horne and Holley. Horne's acquisition of the property in a manner adverse to his associate made him a constructive trustee for Holley.

In *Jones* v. *Clary*, 194 Va. 804, 75 S.E.2d 504 (1953), Jones had agreed that at a judicial sale he would bid for others, but he had the property conveyed to himself. We upheld the ruling of the trial court, based upon a finding that a contract of agency was established, that Jones held the land as constructive trustee for his principals. We approved this statement of the law:

> The principle applicable to this class of contracts is stated in A.L.I. Restatement, Restitution § 194 (2), p. 795, as follows:

"A person who agrees with another to purchase property on behalf of the other and purchases the property for himself individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other." In the Comment to Subsection (2), page 799, it is said: "The rule stated in this Section is applicable where one person agrees to purchase the property on behalf of another, whether he undertakes to purchase it in the name of the other, or in his own name, or in their joint names."

194 Va. at 805-06, 75 S.E.2d at 505.

In the present case, the chancellor stated in his oral opinion that he was not holding that "any fraud occurred". We construe this remark to mean that he did not find actual fraud, as distinguished from constructive fraud. A constructive trust arises not only when there has been actual fraud, but whenever one holding title to property "is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it". Scott, *supra,* § 462 at 3413. As one commentator has said, "[N]ot...all constructive trusts are based on 'fraud', unless that word is used in its broadest sense to include all conduct which equity treats as unfair, unconscionable and unjust". Bogert, *The Law of Trusts and Trustees,* § 471 at 22-23 (2d ed. rev. 1978). *See also Scott, supra,* § 462 at 3412. Here, the chancellor in effect ruled that the Leonards had the equitable duty to convey to Counts title to the rear parcel of the Cassell land. The relief granted may be equated with specific performance of the agreement between Leonard and Counts, although Counts has steadfastly maintained that he is not seeking relief under that theory.

The Leonards argue that the chancellor erred in granting relief against Betty J. Leonard, who was not a party to the agreement between her husband and Counts. Indeed, the chancellor made no specific finding as to Mrs. Leonard, but merely ruled that the Leonards were constructive trustees. We have long held, as the Leonards note, that where a husband and wife own land as tenants by the entirety with right of survivorship one spouse who executes a contract for sale of the property cannot bind the other who has not executed the agreement. *Ingram* v. *Lunsford,* 216 Va. 785, 224 S.E.2d 129 (1976). But in the present case, the agreement was made before the tenancy by the entirety was created. Leonard could not eliminate Counts's interest by having title to the entire property conveyed to

himself and his wife, as tenants by the entirety. It was the customary practice of Leonard and his wife to take title to lands in this manner. It is therefore reasonable to conclude that he acted as her agent in the bidding on and purchasing of the property and the establishment of the tenancy by the entirety, so that she was bound by his agreement with Counts. She acknowledged that she became aware about October 4 that Counts was interested in acquiring the rear parcel, and she agreed with her husband on October 6, six days before the deed from the Cassells to the Leonards was acknowledged and recorded, on the purchase price to be paid by Counts and the restrictions to be included in the deed to him. Mrs. Leonard cannot then, knowing of Counts's interest in the property, exclude him by taking the conveyance with her husband.

We hold that the trial court did not err in ruling that the Leonards held title to the rear parcel of the Cassell land as constructive trustees for Counts. Accordingly, we will affirm the final decree of the trial court.

*Affirmed.*