# RONNIE T. CAMPBELL

## v.

# WILLARD N. CORPENING, ET AL.

Record No. 820902

September 6, 1985

Present: All the Justices

*James Douglas Hundley (Deborah L. Fletcher; Wells, Axselle, Hundley & Johnson,* on brief), for appellant.

*James M. Minor, Jr. (Donald W. Lemons; Minor & Lemons, P.C.,* on brief), for appellees.

POFF, J., delivered the opinion of the Court.

On this appeal, we consider whether the chancellor erred in imposing a constructive trust on income produced by six radio relay stations. These devices, also known as repeaters, relay radio signals for mobile telephones and other forms of radio wave transmission. The commercial value of the repeaters, aside from their intrinsic worth, lies in the income earned under contracts with customers who use them.

The repeaters and the right to collect money due under the user contracts were initially owned by Commonwealth Communications, Inc. (the Corporation). In June 1976, the Corporation pledged all its assets, including the repeaters and "contract rights", as collateral for a $125,000 loan to NB Bank of Richmond (the Bank). James Wicker, president of the Corporation, and appellee Willard Corpening were guarantors on the note.

In October 1976, the Corporation sold the repeaters, purportedly "free from all claims and encumbrances", to a partnership composed of Wicker and appellant Ronnie Campbell. Following this transaction, Campbell began collecting the money paid under the user contracts.

In February 1977, the Bank notified the Corporation and the guarantors that the note was in default and that the Bank intended to sell the collateral at public auction. Campbell, asserting the partnership's rights, challenged the Bank's right to foreclose and obtained a temporary injunction enjoining the Bank from selling the repeaters pending a determination of ownership. A public auction of all the Corporation's assets except the repeaters was conducted February 22, 1977. Corpening and his wife were the successful bidders. As shown by the bill of sale, the Corporation's "contract rights" were among the assets acquired. The purchase price was $20,000, for which the Corpenings signed a demand note payable to the Bank, and the Bank credited the Corporation's note by that amount.

The dispute between Campbell and the Bank was adjudicated in March 1977. The chancellor ruled that title to the repeaters had passed to the Wicker-Campbell partnership in 1976, but that its title was encumbered by the Bank's security interest and the Bank had the right to foreclose. Campbell, representing the interest of the partnership, filed a petition for appeal from this ruling. We refused the petition, and the Bank notified all interested parties that it intended to sell the repeaters at public auction.

Following negotiations with the Bank, the Corpenings agreed to sign a new note in the amount of $131,213.23 in satisfaction of the $20,000 demand note and Corpening's guarantee of the Corporation's note. The new note, dated April 29, 1977, was secured by liens on real estate owned by the Corpenings. As part of the exchange, the Bank assigned the Corporation's note to the Corpenings.

Notwithstanding this refinancing transaction, the Bank, apparently relying on the March 1977 decree, conducted a public auction on December 5, 1977, and Campbell purchased the repeaters for $14,000.

In July 1980, the Corpenings filed suit against Campbell and the partnership, asking the chancellor to declare that they had acquired the contract rights on the repeaters at the February 22, 1977 sale and, thus, were entitled to the income Campbell had collected since that time. They also sought a determination that the Bank's assignment to them of the Corporation's note carried with it the Bank's security interest in the repeaters themselves and that the Bank thereby lost its right to sell the repeaters to Campbell at the December 5, 1977 auction.

By final decree entered February 23, 1982, the chancellor declared that the Corpenings' purchase of the Corporation's "contract rights" at the February 22, 1977 foreclosure sale included rights under the user contracts and imposed a constructive trust on the money Campbell had collected from users. He declared further that the Corpenings had acquired the Bank's security interest in the repeaters themselves.

■ The only questions before us are whether the chancellor erred in imposing a constructive trust on the money collected by Campbell from contract users* and whether the chancellor should have permitted certain parol evidence. Because Campbell failed to make a proffer for the record below, we have limited our consideration to the first question. *See Whittaker* v. *Commonwealth*, 217 Va. 966, 968-69, 234 S.E.2d 79, 81-82 (1977).

■ We analyze this question in two sub-parts. The chancellor expressly found that the Corpenings purchased the contract rights of the Corporation at the public auction of February 22, 1977. This finding is conclusively supported by the evidence. Consequently, we must determine whether, as the chancellor ruled, the contract rights purchased by the Corpenings included the right to collect payments due under the user contracts. If that ruling was correct, then we must determine whether imposition of a constructive trust on the payments collected by Campbell since February 22, 1977 was the appropriate remedy.

---

* Contrary to Campbell's assignment of error, the chancellor did not impose a constructive trust on the repeaters themselves but only upon the money he had collected under the user contracts.

■ We are of opinion that the chancellor's ruling was correct. The nature of a repeater is such that an owner typically contracts with others for its use. While the repeater has some intrinsic value, the owner's most valuable asset is the right to contract with others and collect user fees. This contractual right is a species of property, separate and apart from the physical asset and, as such, is freely alienable.

■ In this case, the Corporation could have pledged the repeaters as collateral for the loan, yet retained its rights under its contracts with users of the repeaters. Instead, it pledged all its assets, expressly including its "contract rights". Campbell can support no claim to those rights. The Corporation sold ownership of the repeaters to the Wicker-Campbell partnership in October 1976. Wicker, president of the Corporation, knew that the Bank held a security interest in the contract rights as well as in the repeaters. As Wicker's partner, Campbell was chargeable with the same knowledge, *see* Code § 50-12, and he was on notice that the Bank had the right to foreclose on the Corporation's contract rights at the February 22, 1977 auction. The chancellor ruled, and we agree, that the Corpenings purchased the contract rights at that sale and, thus, became entitled to the income derived therefrom.

The question remains whether the chancellor applied the appropriate remedy. Campbell argues that he is guilty of no wrongdoing and that the chancellor erred in imposing a constructive trust. But, it is important to understand the purpose and function of this unique tool of courts of chancery.

■ In the interest of justice, equity treats as done what ought to be done, and a chancellor is empowered to fasten a trust upon the conscience of a party who has acquired property to which another has a superior right.

"Constructive trusts arise, *independently of the intention* of the parties, *by construction of law.* . . . They occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit."

*Leonard* v. *Counts*, 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980) (quoting 1 *Minor on Real Property* § 462 at 616 (2d ed. Ribble 1928)) (emphasis in original).

■ We hold that the Corpenings, who acquired the contract rights at the February 22, 1977 foreclosure sale, have the superior claim to the money collected by Campbell under the user contracts and that the chancellor properly imposed a constructive trust upon that money. Accordingly, we will affirm the decree.

*Affirmed.*