In re MEPCO, INC., Debtor.

Enterprise Leasing Company of
Norfolk/Richmond, Movant,

v.

Mepco, Inc., Respondent.

Mepco, Inc., Plaintiff,

v.

Enterprise Leasing Company of Nor-
folk/Richmond and First Virginia
Bank–Southwest, Defendants.

Bankruptcy No. 7–01–03842–WSR–11.
Adversary No. 7–01–00133.

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

Nov. 20, 2001.

Douglas T. Stark, Magee, Foster, Goldstein & Sayers, Roanoke, VA, for MEPCO, Inc.

Richard C. Maxwell, Woods, Rogers & Hazlegrove, Roanoke, VA, Michael P. Cotter, VanDeventer Black, LLP, Norfolk, VA, for Enterprise Leasing Company of Norfolk/ Richmond.

Richard L. Derrico, Roanoke, VA, for First Virginia Bank–Southwest.

## MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

Enterprise Leasing Company of Norfolk/Richmond ("Enterprise") was in the midst of completing a vehicle leasing/financing transaction with MEPCO, Inc. ("MEPCO") when it learned, doubtless to its shock and dismay, that without any notice or warning MEPCO had filed a petition in this Court under Chapter 11 of the Bankruptcy Code. MEPCO has brought this adversary proceeding to deny Enterprise any claim as either an owner of, or a secured creditor as to, certain MEPCO motor vehicles which Enterprise paid off immediately prior and following the filing of the bankruptcy petition. Enterprise has quite understandably perceived this effort as an unjustified and entirely inequitable attempt to deprive it of the benefit of its bargain with MEPCO after Enterprise had substantially performed its part of the agreement. For its part Enterprise has filed motions pursuant to Bankruptcy Rule 9014 seeking relief from the stay and a declaration requiring MEPCO to assume or reject a lease agreement signed by the parties before bankruptcy. Determining the correct answer to this dispute turns on the interplay of certain provisions of the Bankruptcy Code and Virginia law.

MEPCO also seeks in this proceeding to avoid any security interest held by First Virginia Bank–Southwest against any of its vehicles. At the conclusion of a hearing held before the Court on October 22, 2001, it was agreed that Enterprise was entitled to relief as to eight vehicles titled in its name on the date of filing. An order to such effect was entered on October 25, 2001 and such vehicles are no longer in issue. This opinion deals with eleven other vehicles titled in MEPCO's name on the bankruptcy filing date.

## FINDINGS OF FACT

MEPCO is a mechanical, electrical and plumbing contractor which commenced business on or about August 1, 2000, just over a year prior to its bankruptcy filing. MEPCO owns some trucks and automobiles which it uses in the conduct of its business. Prior to the transaction with Enterprise, MEPCO was obligated on certain loans to GMAC, Ford Motor Credit and First Citizens Bank which had provided acquisition financing to MEPCO to obtain eleven vehicles. All of these loans were secured by recorded liens on the vehicle titles in accordance with the requirements of Virginia law. Sean V. Jimenez, a sales representative of Enterprise, became aware of MEPCO's existence, apparently simply by seeing some of its vehicles, and called upon it to explore a possible business arrangement.

MEPCO, as is true no doubt of most new businesses, was interested in reducing its monthly obligations and thereby increasing its free cash flow. Enterprise proposed a sale-and-leaseback transaction

under which it would pay off the lenders holding liens on the vehicle titles, become the owner of the vehicles, and lease them back to MEPCO under 48–month lease agreements. The purchase price would be the loan payoff amounts without regard to the actual fair market values of the vehicles in question. A portion of each lease payment would be applied to a "Depreciation Reserve" which would reduce the book value of the respective vehicle to a residual value, which appears to be based on the presently anticipated wholesale value of the vehicle at the end of the lease term based on a 15,000 miles per year average usage allowance. In general terms, after the end of the 48–month lease term, the lessee (*i.e.*, MEPCO) would be obligated to pay Enterprise the difference between the actual wholesale value of the vehicle at that time as determined by Enterprise "in good faith" and the residual book value under the lease agreement.[1] If the actual wholesale value of the vehicle at that time exceeded the residual book value, Enterprise would reimburse the excess amount to the lessee.[2] Although the lease agreement does not grant the lessee an express option to purchase the leased vehicles at the end of the lease term for their then actual wholesale values, Enterprise's marketing materials state that the customers will have that right[3] and both Enterprise's and MEPCO's witnesses who testified confirmed their understanding that MEPCO would have that option. The total financial obligation to be assumed by MEPCO under the terms of the lease agreement included, in addition to the loan payoff amounts, the titling tax, licensing fee, and registration fees payable to the Commonwealth of Virginia to get the vehicles titled over into Enterprise's name. In addition, MEPCO elected an optional "Full Maintenance Program" under which for an additional monthly fee Enterprise assumed the financial responsibility for the maintenance and repair of the vehicles during the lease term.

To document the terms of their arrangement, the parties signed a Master Equity

---

1. The agreement does provide in effect for a floor amount for the wholesale value at lease termination equal to 20% of the cost of the vehicle. In other words, if the actual wholesale value of the vehicle at the end of the lease term were less than 20% of the cost of the vehicle, the lessee's obligation would be limited to the difference between the book value of the vehicle and 20% of its "Delivered Price". This limiting factor is disregarded, however, in 3 situations: (i) where the lease term is more than 48 months, (ii) the usage of the vehicle is more than a 15,000 mile per year average, or (iii) where, in Enterprise's "sole judgment", the vehicle "has been subject to damage or any abnormal or excessive wear and tear". Master Equity Lease Agreement paragraph # 3(d).

2. The same limiting factor of 20% of a vehicle's "Delivered Price" is likewise applicable to Enterprise's obligation to the lessee if a vehicle's actual wholesale value exceeds its residual book value under the lease schedule.

3. It is apparent that the actual agreement between the parties is broader than the express provisions of the Master Equity Lease Agreement although the Agreement states that it "contains the entire understanding of the parties." (Paragraph # 16) Enterprise's "Fleet Management Proposal" dated July 12, 2001, the same date Mr. Norris signed the Agreement on behalf of MEPCO, describes an "Open End Lease" rather than the fixed term lease actually provided in the Agreement and accompanying schedules. The proposal boasts that it "Provides Leasing Leverage With Ownership Rights" with "Prime Rate Based Financing Options" and "Open Ended Options At Completion Of Lease Term". As to the latter inducement, the proposal delineates the customer's options at the end of the stipulated lease term as follows: (i) "Enterprise can sell your vehicles on your behalf"; (ii) "You can arrange for the sale of your vehicles"; (iii) "You can continue to use vehicles after lease term is completed or depreciated to 0"; and (iv) "Vehicles may be purchased by you for reduced book value".

Lease Agreement (the "Agreement"), a printed standard Enterprise agreement form. Leon Norris, MEPCO's vice-president, signed the agreement in Roanoke, Virginia on July 12, 2001, and Michael Wright, Enterprise's Group Sales Manager, did so in Newport News, Virginia on July 20, 2001. The specific financial terms applicable to each vehicle were set forth on individual schedules to be subject to the general terms of the Agreement. All of the vehicles which are in issue are and have been located at all relevant times in Virginia and all of them have Virginia certificates of title. The Agreement provides that it "will be governed by and construed in accordance with the substantive laws of the state where Lessor's office is located (as set forth below), which law will apply in the event of any conflict of law." That office is indicated to be in Newport News, Virginia.

On August 14, 2001 Enterprise issued its check in the amount of $61,892.09 in favor of Ford Motor Credit for four vehicles. On August 22 new titles for these vehicles were issued in MEPCO's name free and clear of any recorded lien and Ford forwarded them to Enterprise. Also on or about August 14, Enterprise issued a check in the amount of $70,430.44 payable to GMAC for four other vehicles. GMAC marked its recorded liens satisfied and sent the certificates of title to Enterprise, which on August 30 forwarded them together with the Ford titles to MEPCO with instructions to sign and return them to Enterprise. Also on August 30 Enterprise issued a third check payable to First Citizens Bank in the amount of $61,568.52 in full payment of the liens on three other vehicles. On September 4, 2001 MEPCO filed its bankruptcy petition. Three days later First Citizens Bank released its liens on the three vehicle titles it held and forwarded them to Enterprise, which, still unaware of MEPCO's bankruptcy filing,

on or about September 12 forwarded them on to MEPCO to be signed and returned to Enterprise. MEPCO has not signed any of the vehicle titles and all eleven vehicles are still titled in its name, four of them with titles having no recorded lien and the other seven with titles having recorded liens which have been released by the indicated lien holders. The parties have stipulated that the loans on the three First Citizens Bank titles were not paid until after the bankruptcy filing.

As an additional complication, First Virginia Bank–Southwest ("First Virginia") is also a secured creditor of MEPCO, which had granted the bank a standard Uniform Commercial Code security interest in, among other things, all of its "equipment", which term includes motor vehicles. The security interest was perfected by properly filed financing statements but not upon the vehicles' certificates of title. All of the vehicles in question were used in the normal conduct of MEPCO's business and none was held for sale in the ordinary course of its business.

Although Enterprise was clearly unaware of MEPCO's financial difficulties at the time the Agreement was signed, as well as when the checks were issued and the certificates of title were sent to MEPCO, and one of its witnesses testified that Leon Morris exhibited a stack of statements billed or ready to be billed for work allegedly performed by MEPCO when questioned as to "how's business", there has been no offer of any evidence that Enterprise secured any definite representation from MEPCO concerning its financial condition and ability to fulfill its obligations to Enterprise although it did require an application containing credit references. Accordingly, while Enterprise's suspicions are apparent and understandable, the Court finds that no fraud or intent on MEPCO's part to mislead or

trick Enterprise into doing what it did has been established, or that MEPCO attempted to manage its filing date in order to take advantage of Enterprise. In short, the Court has been offered no evidence to cause it to question the good faith of either party in connection with the transaction in question.

## CONCLUSIONS OF LAW

This Court has jurisdiction of these motions and this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(E), (K) and (O).

The transactions at issue here can be divided into two broad categories, specifically, pre-petition and post-petition. This opinion will consider them in that order.

### I. PRE–PETITION TRANSACTIONS

### A. LIENS SATISFIED BY ENTERPRISE

These are the GMAC and Ford transactions where Enterprise paid off the obligations secured by the recorded liens and such liens were released prior to bankruptcy. This category is further divided into two sub-categories: the Ford transaction in which new titles free and clear of any recorded liens were issued prior to the filing date, and the GMAC transaction in which the original titles were still in effect but the liens had been released on the face of the titles before the filing date.

Section 541(a)(1) of the Bankruptcy Code (11 U.S.C. § 541(a)(1)) provides that a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." MEPCO asserts that it owns the GMAC and Ford vehicles free and clear of any interest in favor of Enterprise under the Agreement by virtue of the so-called

"strong-arm" power of the bankruptcy trustee under 11 U.S.C. § 544(a)(1) to avoid a transfer of property which is unperfected as to

> a creditor that extends to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

The next subsection, 11 U.S.C. § 544(a)(2), gives the trustee the rights of a creditor that obtains "an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists". The term "transfer"

> means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

11 U.S.C. § 101(54). Section 541(a)(3) provides that property of the estate includes all property which the trustee recovers under section 550 of the Code, which section refers, in part, to transfers which are avoidable by the trustee under section 544. Although a bankruptcy debtor is not equivalent to a bankruptcy trustee, in a Chapter 11 reorganization case the debtor as debtor-in-possession when no trustee has been appointed has the same "rights ... and powers", with certain exceptions not relevant in this matter, "of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a). Accordingly, in this case MEPCO has the same ability to assert the trustee's "strong-arm" powers against Enterprise that a trustee appointed for its bankruptcy estate would have.

While MEPCO's rights as debtor-in-possession are provided by the Bankruptcy Code, the determination of whether the "strong-arm" bankruptcy powers trump Enterprise's contractual rights is controlled by Virginia law. *In re Kitchin Equipment Co. of Virginia, Inc.,* 960 F.2d 1242, 1245 (4th Cir.1992). To be more specific, whether the rights of a theoretical judgment lien or execution creditor would be superior to Enterprise's claims against MEPCO's vehicles must be ascertained by reference to Virginia law establishing the rights of judgment creditors against property in which other parties claim an interest. Enterprise attempts to parry MEPCO's attempted exercise of the trustee's "strong-arm" powers by arguing that the vehicles were excluded from being property of the estate on the ground that MEPCO held the vehicles and vehicle titles as constructive trustee for Enterprise's benefit. Property which is held by the debtor by legal title alone and without actual equitable ownership is not part of the bankruptcy estate. 11 U.S.C. § 541(d); *Begier v. IRS,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); *In re Dameron,* 155 F.3d 718, 721–22 (4th Cir.1998); *Mid–Atlantic Supply, Inc. v. Three Rivers Aluminum Co.,* 790 F.2d 1121, 1124 (4th Cir. 1986). The determination of whether particular property is subject to a constructive trust and therefore not included as part of the "property of the estate" is also a matter of state property law. *In re Cardian Mortgage Corp.,* 122 B.R. 255, 258–59, (Bankr.E.D.Va.1990); *In re Crotts,* 87 B.R. 418, 420 (Bankr.E.D. Va.1988); *See generally, In re FCX, Inc.,* 853 F.2d 1149, 1153 (4th Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). The issue presented in this case seems to suggest the type of quandary posed by the conundrum, "what happens when an irresistible force, in this case the Trustee's 'strong-arm' powers, meets the immovable object, here identified as a constructive trust?" The Court concludes that the proper answer to this query is found by ascertaining whether under Virginia law a creditor who obtained a judgment lien and execution lien against MEPCO on September 4, 2001, the date the bankruptcy petition was filed, would have obtained rights superior or inferior to Enterprise's rights under the Agreement to the vehicles then in MEPCO's name.

The laws governing titling and transfer of motor vehicles by Virginia residents are statutory. Section 46.2–600 of the Code of Virginia requires that each person who "owns" a vehicle obtain a certificate of title for it. Section 46.1–628 requires a vehicle owner when "transferring or assigning his title or interest thereto" to "fully and correctly endorse the assignment and warranty of title on the certificate of title". Section 46.1–632 authorizes the Division of Motor Vehicles, when the certificate of title is not available, to "receive the application and investigate the circumstances of the case" and issue a new certificate of title when satisfied that the applicant is the new owner. A certificate of title is required to "show all security interests ... in the order of their priority ..." *Va.Code* § 46.2–636. (Repl.Vol. 1998). However, "a security interest in a motor vehicle ... which is inventory held for sale shall be perfected only as provided in §§ 8.9–301 through 8.9–408." *Va.Code* § 46.2–637. A Virginia certificate of title showing a security interest "shall be adequate notice to the Commonwealth, creditors and purchasers that a security interest in the motor vehicle exists ..." *Va. Code* § 46.2–638. Section 46.2–644 provides that an execution lien "shall constitute a lien, subsequent to security interests previously recorded by the Department and subsequent to security interests in inventory held for sale and perfected as otherwise

permitted by law, when the officer making the levy reports to the Department ... that the levy has been made and that the motor vehicle ... levied on has been seized by him." The Court has not found any statute which clearly defines the relative rights between a levying creditor and one who has paid for a vehicle but has not obtained a certificate of title for it and thereby become the "record" owner of the title under Virginia law. It does seem fairly clear that the rights of a purchaser of a vehicle at an execution sale would take priority over the unrecorded rights of such a prospective owner. *Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc.*, 256 Va. 243, 506 S.E.2d 14 (1998) (Bona fide purchaser prevails over rights of recorded lienor whose lien was fraudulently released by vehicle owner.) MEPCO, however, must rely on the "strong-arm" power of the trustee as a judgment creditor, rather than as a bona fide purchaser, because the trustee has the rights of a bona-fide purchaser only as to real estate, not personalty. 11 U.S.C. § 544(a)(3). Furthermore, the rights of the bankruptcy trustee are not those of a judgment lien creditor who has succeeded in obtaining enforcement of its judgment or execution lien as of the date of filing, but rather one who has simply acquired the lien as of such date, a potentially significant difference. Indeed, Virginia provides an express statutory remedy to one other "than the one against whom the process issued" who claims the property levied on to execute a suspending bond and file a motion in a circuit court to determine the title to the property in dispute. *Va.Code* § 8.01–365 (Repl.Vol.2000). *See also Va.Code* §§ 8.01–367, –370 (Repl.Vol.2000); *Barbuto v. Southern Bank*, 231 Va. 63, 340 S.E.2d 813 (1986) (dispute as to ownership of contents of safe deposit box levied on by judgment creditor).

 Enterprise and MEPCO have pitched their battle on the issue whether the Agreement is a "true" lease or one intended for security, *i.e.*, a security interest. The Court agrees with the parties that this is the critical issue determining the contest between them. If Enterprise is simply a creditor of MEPCO, its rights which were unperfected on the filing date are lost to the debtor-in-possession exercising the Trustee's "strong-arm" powers of 11 U.S.C. § 544. This is so because Virginia law distinguishes between the rights of a creditor and those of a purchaser of property deemed to be held by the debtor as a constructive trustee.

> It is a universal principle of equity that a bona fide purchaser for value from the trustee [of an implied trust] takes the legal title free of any resulting or other trust of which he has no notice. However, it is carefully to be observed that creditors stand on a wholly different footing. The creditor, unlike the purchaser, not having laid out his money on that specific property, but merely on the general credit of his debtor, is bound by all the equities which bind his debtor. As it is generally expressed, the creditor stands in the shoes of his debtor.

19 Michie's Jurisprudence 119, Trusts § 46 (Repl.Vol.1991), citing and almost exactly quoting from *Ransome v. Watson's Administrator*, 145 Va. 669, 675, 134 S.E. 707, 709 (1926), which quotes from Lile's Notes on Equity Jurisprudence. Accordingly, if Virginia law would impose a constructive trust upon the vehicle titles in MEPCO's name and possession on the filing date in favor of Enterprise, then such status will defeat the Trustee's "strong-arm" powers under 11 U.S.C. § 544. In support of its contention that it is entitled to the benefit of a constructive trust upon the vehicle titles, Enterprise cites the case of *In re Car Sales, Inc.*, 9 B.R. 76 (Bankr.E.D.Va. 1981), which involved a contest between

the bankruptcy trustee of a car dealer which had sold and been paid for an automobile prior to bankruptcy, had delivered possession of it to the purchaser and had issued to him a temporary "30–day tag". The dealer failed to forward the certificate of title to the Division of Motor Vehicles prior to filing its bankruptcy petition and the trustee attempted to lay claim to the vehicle. Quite understandably the Bankruptcy Court firmly rejected the trustee's claim and ruled that he was obligated to fulfill the dealer's duty to execute the title and forward it to the DMV. The differences between that situation and the one presented here are significant, particularly the status in that case of the debtor as a licensed car dealer, its delivery of physical possession of the vehicle to the purchaser prior to bankruptcy, and the fact that the purchaser really couldn't be faulted for anything done or left undone on his part.

■ In examining the legal relationship created between Enterprise and MEPCO, it bears noting that even though both parties apparently understood and intended that legal title to the vehicles would be put in Enterprise's name during the term of the Agreement, neither intended a true "sale" in the classic sense of the term. Indeed, the transfer price of the subject vehicles was determined by reference to the existing liens against their titles rather than their actual fair market values. The "sale" of the vehicles was simply part of a larger transaction in which the use of the vehicles was simultaneously leased back to MEPCO with no actual change in the physical possession of the vehicles ever actually occurring. The Supreme Court of Virginia has just recently had occasion to confirm that "[i]n order to effect a transfer of the ownership of a motor vehicle, two things are required: (1) the owner must actually deliver the endorsed certificate of title to the transferee, and (2) the owner must deliver possession of the vehicle to the transferee." *Allstate Insurance Company v. Atlanta Casualty Company*, 260 Va. 148, 155, 530 S.E.2d 161, 165 (2000). The terms of the Agreement largely insulated Enterprise from the burdens and risks of ownership as all financial obligations associated with ownership of the vehicles were saddled upon the lessee. The economic realities of the Agreement were not substantially different than if MEPCO had simply obtained a refinancing loan from Enterprise to satisfy the existing loans and establish a new loan repayment schedule closely tracking the vehicles' expected economic depreciation over the term of the loan. At the end of the loan term of 48 months, MEPCO would have to satisfy the then loan balance either by redeeming the vehicle titles by payment of the balance from other sources of funds, or by sale of the vehicles for their then wholesale value, gaining the benefit of any excess vehicle value over the loan payoff while being liable for any deficiency. If MEPCO failed to act, Enterprise in either case could sell the vehicles, either as owner under a lease arrangement or as secured party under a credit transaction. Simply stated, on the basis of the practical financial realities of the Enterprise/MEPCO transaction, there seems to be scant difference between the equities of Enterprise's status as a prospective title owner of the vehicles versus those of Enterprise as an unperfected lien creditor on the filing date. Enterprise's own business procedures have placed it in jeopardy as there appears to be no reason why it could not have simply purchased the loans from GMAC and Ford Motor Credit rather than paying them off and thereby obtained possession of the certificates of title to submit them to MEPCO for signing with the recorded liens remaining intact until the certificates were actually ready to deliver to the Division of Motor Vehicles for reissu-

ance in Enterprise's name. *See In re Spring Grove Transport, Inc.*, 202 B.R. 862 (Bankr.E.D.Va.1996)(G. E. Capital purchased vehicle loan and obtained original lienor's power of attorney to release lien on titles, it released lien on 11/30/95 but did not mail certificates of title and applications for new titles until 12/21/95, after 12/15/95 bankruptcy filing date, thereby losing its lien position to bankruptcy trustee.)

■ It might be reasonably observed that Enterprise has gotten so close to the line dividing a "true" lease from one which is a disguised security interest that it is difficult to say which side of that line it has ended up on or indeed whether it has landed actually astride it. Courts have labored to develop sound principles which sometimes turn on quite fine distinctions to distinguish between the two types of agreements. In making its decision in the present dispute, this Court has been assisted by the analysis of Judge Anderson of this Court in the case of *In re Architectural Millwork of Virginia, Inc.*, 226 B.R. 551 (Bankr.W.D.Va.1998), which discussed at some length the current state of the Virginia statutory provisions on this subject. After considerable thought to the problem, the Court concludes that the Agreement is a "true" lease for the following principal reasons:

1) Both parties appear to have understood and intended that legal title to the vehicles would be transferred to Enterprise as an element of the transaction and the Agreement states that the parties intended to create a lease arrangement;

2) Enterprise was to receive the tax benefits of ownership of the vehicles and be treated as the owner for tax purposes;

3) Although MEPCO apparently would have the right to extend the lease until the residual value of the vehicles had been reduced to zero, it was not obligated to do so;

4) The residual value of the vehicles at the end of the lease term was not a nominal amount and therefore MEPCO's purchase option was not for a nominal amount;

5) No evidence was offered that any accrual of equity in favor of MEPCO under the term of the lease was expected to be appreciable;

6) Although MEPCO could purchase for itself or sell for its own account the vehicles at the end of the lease term, it was under no obligation to do so and could simply rely on its right to pay Enterprise the difference between book value and actual value and leave to Enterprise the problem of disposing of the vehicles, while the borrower in a credit transaction could be compelled to pay the loan balance with no legal obligation upon the secured creditor to dispose of the vehicles at their then wholesale value;

7) *Va.Code* § 46.2–640.1 provides that "in case of motor vehicles ..., a transaction does not create a sale or security interest merely because it provides that the rental price is permitted or required to be adjusted under the agreement either upward or downward by reference to the amount realized upon sale or other disposition of the motor vehicle ..."; and

8) There appear to be no provisions in the Agreement or the actual understanding between the parties which would require either being classified as a lease intended for security under the extended definition of "security interest" contained in *Va.Code* § 8.1–201(37)(Repl.Vol.2001).

■ Accordingly, for the reasons noted, the Court believes that under Virginia law the Agreement does constitute a lease agreement. The Court further believes that Virginia courts would impose a con-

structive trust upon MEPCO to transfer title to the vehicles to Enterprise because in Virginia constructive trusts are created "not only where property has been acquired by a fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit." *Nedrich v. Jones,* 245 Va. 465, 429 S.E.2d 201, 206 (1993), quoting with approval from *Leonard v. Counts,* 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980). Of course here MEPCO was already the legal owner of the subject vehicles, subject to the GMAC, Ford Motor Credit and First Citizens Bank loans, and the transfer of funds was directly to such lienors. The Court sees no reason, though, to treat these payments any differently than if they had been made by checks payable jointly to MEPCO and the lienors or to MEPCO for the account of such lienors. In either case MEPCO would have ended up owning the vehicles free and clear of the prior lien claims. Finally, the Court concludes that Virginia courts would hold that such a constructive trust would have priority over the status of a judgment creditor of MEPCO having obtained an execution lien against the Debtor's vehicles after Enterprise had paid the acquisition price for the vehicles but prior to MEPCO's execution of the certificates of title over into Enterprise's name. While more than 60 days have elapsed since the filing date and therefore under 11 U.S.C. § 365(d)(1) the lease agreement ordinarily would be deemed rejected, because the status of such vehicles has been the subject of legitimate doubt and dispute, the Court will require the Debtor within fifteen days of this date to file a notice of its intent to assume or reject the Agreement as to the eight GMAC and Ford vehicles, and if it decides to assume the leases, to tender all amounts due to Enterprise to cure all delinquencies

owing upon the vehicles sought to be assumed. The Debtor will also be directed to execute the GMAC and Ford titles and transmit promptly to Enterprise's counsel all eleven vehicle titles now in its possession.

**B. LIEN STATUS OF FIRST VIRGINIA BANK**

■ Moving from the exceedingly close question of the relative rights of Enterprise and MEPCO to the considerably easier question of MEPCO's rights in the vehicles versus those of First Virginia, the Court finds little difficulty in concluding that MEPCO as debtor-in-possession is entitled pursuant to 11 U.S.C. § 544(a) to avoid First Virginia's security interest in its vehicles. While Virginia law clearly permits a lender to an automobile dealer holding vehicles for sale in the ordinary course of its business to perfect a security interest in such vehicles by simply filing normal UCC financing statements (*Va.Code* § 46.2–637), as to other borrowers the security interest must be shown on the face of the vehicle titles. *Va.Code* § 46.2–636. In this case MEPCO held its vehicles for use in its business, not for the purpose of sale to its customers. Any number of bankruptcy cases in Virginia have held that the liens of creditors who have failed to get their liens noted on the certificates of title before bankruptcy intervened lost their security rights to the bankruptcy trustee. *Richlands Nat. Bank v. Smith,* 34 B.R. 749 (W.D.Va. 1983)(Williams, J.); *In re Darrington,* 251 B.R. 808 (Bankr.E.D.Va.1999); *In re Spring Grove Transport, Inc.,* 202 B.R. 862 (Bankr.E.D.Va.1996); *In re Johnson,* 179 B.R. 800 (Bankr.E.D.Va.1995); *In re Fregosi,* 23 B.R. 641 (Bankr.E.D.Va.1982). These decisions are fully in accord with decisions of the Supreme Court of Virginia upholding the priority of judgment and

attachment liens over other liens which are not shown on the face of the certificates of title, even where such failure is not attributable to the lienor. *C.I.T. Corporation v. W.J. Crosby & Company, Inc.*, 175 Va. 16, 7 S.E.2d 107 (1940)(attachment lien); *Maryland Credit Finance Corp. v. Franklin Credit Finance Corp.*, 164 Va. 579, 180 S.E. 408 (1935)(judgment execution lien). Accordingly, under well established principles, the security interest of First Virginia in MEPCO's vehicles is avoided.

## II. POST–PETITION TRANSACTION

■ Although Enterprise issued its check to First Citizens Bank prior to the bankruptcy filing, the parties are agreed that payment was not actually made until after the filing had occurred. Moreover, First Citizens did not affirmatively release its security interest until three days after the filing date. Nevertheless, without notice or knowledge of the filing, Enterprise did pay First Citizens's loans in full. The legal consequences of this event are intriguing and the paucity of authority dealing with similar situations is surprising. It is clear that the trustee's "strong-arm" powers under Code § 544(a) are not implicated because this transaction did not occur prior to the filing date. At that time First Citizens had duly recorded liens on the certificates of title it held and Enterprise still had its money in its bank account. Because the Agreement as to those vehicles was executory at the date of filing and MEPCO has not moved to assume the contract during the more than 60 days since then, under 11 U.S.C. § 365(d)(1) such Agreement is "deemed rejected". Because the loans in question were paid in good faith after the filing date and without the approval of the Bankruptcy Court, and the Debtor has made no attempt to assume the Agreement as to such vehicles, the Court believes that the proper result is

that Enterprise has "stepped into the shoes" of First Citizens. In other words, the Court finds that Enterprise is subrogated to First Citizens's loan and security rights against the Debtor and the subject three vehicles to the same extent as if it had post-petition purchased the loans from First Citizens and taken an assignment of all of its rights in the collateral. Because the documents establishing such rights are not before the Court, Enterprise will be granted ten days to file an amended motion for relief as to such vehicles and MEPCO will be granted ten additional days to file its response thereto. If the parties are unable to resolve the issue of these three vehicles to their mutual satisfaction, counsel for the parties are directed to contact the Court's scheduling clerk to set a prompt hearing to consider the issues of relief from the stay and adequate protection.

The Court shall enter contemporaneously an order in accordance with the findings of fact and conclusions of law contained in this opinion.

## ORDER

For the reasons stated in this Court's contemporaneous memorandum opinion, it is

## ORDERED

1) that the security interest of First Virginia Bank–Southwest in MEPCO's motor vehicles is hereby AVOIDED;

2) that the Master Equity Lease Agreement between Enterprise and MEPCO is a true lease agreement and MEPCO is obliged to sign over to Enterprise the eight (8) certificates of title it is holding and which formerly were subject to liens in favor of Ford Motor Credit and GMAC;

3) Enterprise is subrogated to the rights and lien status of First Citizens

Bank against three (3) MEPCO vehicles as of the filing date to the same extent as if all such rights had been expressly assigned by such bank to Enterprise;

4) MEPCO shall forward to Enterprise's counsel all eleven (11) vehicle titles which were sent by Enterprise to MEPCO shortly before or following the petition filing date;

5) Enterprise shall file within ten (10) days of this Order's date an amended motion for relief as to the three (3) titles formerly held by First Citizens Bank and MEPCO shall file its response thereto within ten (10) additional days;

6) MEPCO shall file within fifteen (15) days of this Order's date a notice of its intention to assume or reject the Master Equity Lease Agreement as to the eight vehicles formerly subject to liens in favor of Ford Motor Credit or GMAC, and if such Agreement is to be assumed, shall tender to Enterprise all accrued and due rentals as to such vehicles; and

7) the automatic stay shall remain in effect pending resolution of the matters addressed in preceding paragraphs # 5 and 6 of this order.