COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Bray and Annunziata
Argued at Alexandria, Virginia


GREGORY WILLIAM SULLIVAN
                                           OPINION BY
v.    Record No. 0017-02-4         JUDGE RICHARD S. BRAY
                                          AUGUST 27, 2002
KAREN ANN KNICK, N/K/A
 KAREN KNICK JONES

              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Kathleen H. MacKay, Judge

          Lawrence D. Diehl (Richard M. Wexell; Richard
          M. Wexell & Associates, on brief), for
          appellant.

          Alan B. Plevy (Anna B. Marshall; Smolen
          Plevy, on brief), for appellee.


     Gregory William Sullivan (father) appeals an order of the

trial court permitting his former wife, Karen Ann Knick, n/k/a

Karen Knick Jones (mother), to relocate the parties' minor child

from Virginia to South Carolina.  On appeal, father contends the

court erroneously (1) found a material change in circumstances had

occurred since a recently preceding custody/visitation order, and

(2) concluded the proposed move was in the child's best interests,

without proper consideration of the attendant statutory factors

and related evidence.  Finding the decision of the trial court

plainly wrong and without the requisite support in the evidence,

we reverse the disputed order and remand the proceedings.

## I.   BACKGROUND

The pertinent facts are substantially uncontroverted.  Father and mother were married July 23, 1994, and one child, Kylie, was born to the union on July 13, 1998, following final separation of the parties.  By subsequent "Property Settlement Agreement," mother and father agreed to share "joint custody" of Kylie, with "primary physical custody" in mother, subject to extensive specified visitation in father and "consult[ation] with father on major issues involving Kylie's . . . welfare."[1]  The agreement was later "affirmed, ratified and incorporated" into the final decree of divorce between the parties, entered by the trial court on May 24, 1999.

On January 9, 2001, father lodged a "Petition to Modify Parenting Time, and to Clarify Joint Custody Arrangement" with the trial court, praying the court, inter alia, to "expand" his time with Kylie as a result of "a number of changed circumstances," including his remarriage and new residence situated only several miles from Kylie's home, and the child's age and "expressed interest" "in spending more time with her father."  A related hearing was conducted June 20, 2001, and, by order entered June

---

[1] The parties further agreed that "the welfare and best interests of [Kylie] are their paramount consideration," and both covenanted to "make every effort to promote the relationship between Kylie and the other party."

-

29, 2001, the court granted the requested relief, significantly increasing father's visitation.[2]

On September 16, 2001, within three months of the order enlarging father's visitation, mother advised father of her impending marriage to Steven Jones and intention to accompany him, with Kylie, to the situs of Jones' recent employment in Summerville, South Carolina, approximately five hundred miles distant. In anticipation of related issues pertaining to father's visitation with Kylie, mother proposed a revised schedule, which provided father extended but less frequent contacts with the child.

Father objected to mother's plans and immediately petitioned the trial court to enjoin the move and award him custody of Kylie or, should the court allow the relocation, order "substantial monthly, holiday and vacation visitation" with father. The court awarded father a "Temporary Restraining Order" pending a hearing on the matter.

The court subsequently conducted ore tenus hearings addressing father's petition as well as the merits of mother's relocation plans. Testifying at the proceedings, mother described Kylie as "a very happy, well-adjusted child," and acknowledged the "importan[ce] for [her] to maintain her relationship with

_____

[2] The expanded visitation included alternating weekends, alternating Thursday evenings, extended periods during holidays and each summer, and an additional "uninterrupted week" each year.

. . . father."  Mother emphasized her role as Kylie's "primary caregiver" since birth and, as a result of recent unemployment, her plans to be a "stay-at-home mother."  She described Summerville as "a nice suburb[,] kind of like Alexandria only not built up," with "wonderful amenities," including "a recreation center," "pools," "tennis courts," "bike trails," "walking trails" and "a [nearby] YMCA."  Although the adequacy of mother's present home and furnishings is not in issue, the proposed residence is more spacious and located adjacent to a "playground . . . for [the] community."  Mother's proposed visitation schedule between father and Kylie included an offer to share a portion of the related transportion costs.  However, mother expressed a willingness to "do whatever is in Kylie's best interest," including "staying . . . in Northern Virginia," "[i]f [she] has to."

Steven Jones, mother's husband at the time of the hearings, had recently accepted civilian employment in South Carolina with the Navy, performing "landscape architecture" and "base facility planning."  Jones acknowledged his "prime motivation" for pursuing the move was to locate nearer the South Carolina residence of his eight-year-old son from a prior marriage, thereby affording him "more involve[ment]" in the child's life.  Jones could "transfer" his job site after April 2002, and had already inquired into "positions in [the northern Virginia] area."  A "Rehabilitation Counselor" conversant with Jones'

-

"background, . . . experience and salary" researched the employment in the Washington, D.C. market and found comparable job opportunities available to him in the area.  Asked if he planned a return to Virginia should the court not permit relocation of Kylie, Jones answered he and mother "would work it out" and "do what was necessary . . . to remain a blended family."

Mother presented the testimony of Dr. Joseph Hawley, a licensed clinical psychologist.  Dr. Hawley testified "it would be optimum to have more frequent visitation" between Kylie and her father, but noted "a longer period of time" during each visit "could offset that some."  He cautioned that changes in the visitation schedule "could have a negative effect on the child" because "children like to have predictability," "stability" and "consistency."  However, "adaptation" to the "use [of] the telephone" or "video conferencing" would allow Kylie to "stay in touch with her father."  While he "would want more frequent contact" between the father and daughter, Dr. Hawley opined, "life isn't always the best of all possible worlds."

Father described his relationship with Kylie following the increased visitation resulting from the prior order as "better" "in so many ways," "more relaxed," "not as hurried."  He testified that Kylie had "respond[ed] to the routine" and "has an expectation of normalcy."  Exercising "[e]ntirely" the increased access to the child afforded by the June order, father and Kylie

-

had visited "international children's festivals," "the Children's Museum in Baltimore," "the Children's Museum in D.C.," "the Museum of Natural History," "puppet performances," the "zoo," and "the circus," "a wide range of things." Father was concerned that removing Kylie from her lifetime residence in Virginia to South Carolina would exclude him from "ballet lessons," "sports," "Gymboree," "school plays," and "[a]ll of that," and deprive her of significant "cultural" opportunities available in the Washington, D.C. area.

Father presented the expert testimony of Dr. William Zuckerman, also a licensed clinical psychologist familiar with the instant circumstances. Dr. Zuckerman described mother's visitation proposal as "not optimal." Noting the child had developed "secure attachments" "with both of her parents," a relationship "related to the amount of time a child spends with a parent," Dr. Zuckerman opined that relocation would "occur at the expense of the attachment [she] has with the father," creating "a loss in terms of security and attachment." He concluded the child was better served by existing "regular[]" and "frequen[t]" contacts with father, than infrequent contacts of longer duration.

Cheryl Weitz, a Licensed Clinical Social Worker, interviewed father and Kylie and prepared a "parent/child assessment." Weitz described father as a "highly motivated" parent, "available" to Kylie "emotionally . . . [and] for the whole range of parenting activities." Weitz testified that the June order, increasing the

-

frequency of contact between father and Kylie, had brought a "definite[] improvement in the relationship," an "attachment relationship," between the two. Kylie "was initiating more" with father, "leaning on him," sharing increased "eye contact" and "much more relaxed" and "comfortable" with him.

At the conclusion of the hearing, the trial court, acknowledging the "burden of proof" on mother "to prove . . . the move . . . in the best interest of the child," commented that mother must follow her husband or suffer an "unnatural" separation, with attendant costs and inconvenience. Thus, the court found mother without an "option[]" and reasoned either custody must change or Kylie relocate with mother to South Carolina. Addressing those factors enumerated in Code § 20-124.3, the court observed:

> [T]here is no question . . . that both parents are fit, . . . have an attachment to the child, [and] . . . are prepared to cope with their child's changing needs.
>
> What the mother has offered . . . is generous and considerate, and it shows . . . she appreciated the bond that already existed between [the father] and the child.
>
>   *      *      *      *      *      *      *
>
> I believe that her plan along with modern technology, to some extent, will in fact preserve the relationship between the father and the child in this case. . . .
>
>   *      *      *      *      *      *      *
>
> [T]here will be benefits from her going to South Carolina. The benefits being that she

-

is going to be a stay at home mother.  I
think there is a certain tranquility of
family life that she is describing that will
take place in South Carolina that might not
be here, by virtue of the frantic pace that
we all lead our lives here.

     *     *     *     *     *     *     *

So at this stage I am accepting, allowing
the mother to move provided that she follows
through on the plan that she has put forth
for maintaining the relationship between the
child and the father.

The court memorialized the ruling by order entered November 30,

2001, which included a substantially revised visitation

schedule,[3] and father appeals to this Court.

## II.  RELOCATION

A trial court may, "from time to time . . . , revise and

alter [a] decree concerning the care, custody and maintenance of

. . . children and make a new decree concerning the same, as the

circumstances of the parents and the benefit of the children may

require."  Code § 20-108; Bostick v. Bostick-Bennett, 23

Va. App. 527, 534-35, 478 S.E.2d 319, 323 (1996).  In

determining whether "to modify a decree denying a custodial

parent permission to remove the child from the state, the court

must find (1) a material change of circumstance since the

---

[3] Post-relocation visitation with father included one
weekend each month and an optional additional weekend,
conditioned upon transportation at his expense and advance
notice to mother, extended holiday and summer visits, together
with an additional week annually and a further week, with three
months notice to mother and payment of transportation costs by
father.

-

[prior] decree; and (2) that relocation would be in the child's best interests. In accordance with our prior decisions, the moving party bears the burden of proof." Id. at 535, 478 S.E.2d at 323.

## A. CHANGED CIRCUMSTANCES

Father first contends the trial court erroneously found "a material change in circumstances" between the court's prior visitation order, entered June 29, 2001, and the instant proceedings.

"'Changed circumstances' is a broad concept and incorporates a broad range of positive and negative developments in the lives of the children." Parish v. Spaulding, 26 Va. App. 566, 573, 496 S.E.2d 91, 94 (1998), aff'd, 257 Va. 357, 513 S.E.2d 391 (1999). "Whether a change in circumstances exists is a factual finding that will not be disturbed on appeal if the finding is supported by credible evidence." Ohlen v. Shively, 16 Va. App. 419, 423, 430 S.E.2d 559, 561 (1993) (citation omitted). "In the absence of a material change in circumstances, reconsideration . . . would be barred by principles of res judicata." Hiner v. Hadeed, 15 Va. App. 575, 580, 425 S.E.2d 811, 814 (1993).

Here, the evidence established that, following the June 29, 2001 order, mother, the parent in physical custody of Kylie, had become engaged, anticipated marriage within a month and planned to relocate with her husband to South Carolina. Accordingly,

-

the record supports the finding of a material change in circumstances sufficient to warrant further consideration and determination of the child's best interests with respect to the proposed relocation and companion issues of custody and visitation.[4]

### B.   BEST INTERESTS OF THE CHILD

Father next contends the trial court erroneously concluded that the proposed relocation to South Carolina would promote the best interests of Kylie.  We agree.

"A court may forbid a custodial parent from removing a child from the state without the court's permission, or it may permit the child to be removed from the state."  Scinaldi v. Scinaldi, 2 Va. App. 571, 573, 347 S.E.2d 149, 150 (1986) (citations omitted).  "[I]n a court's decision as to the propriety of relocating the children . . . , 'the welfare of the children is of primary and paramount importance.'"  Parish, 26 Va. App. at 572, 496 S.E.2d at 94 (citation omitted).

> "The court may consider a benefit to the parent from relocation only if the move independently benefits the [child]." Accordingly, "[i]f the trial court finds that relocation is not in the 'best interests of the child,' the trial court must deny the relocation request.  If maintaining the status quo is in the 'best interests of the child,' the court shall

---

[4] Moreover, "whenever the evidence suggests . . . that the relocation of the custodial parent may not be in the child's best interests, the relocation of the custodial parent constitutes a material change in circumstances." Hughes v. Gentry, 18 Va. App. 318, 322, 443 S.E.2d 448, 451 (1994).

-

deny any requests to change custody and order that the status quo be maintained."

Goodhand v. Kildoo, 37 Va. App. 591, 599-600, 560 S.E.2d 463, 466-67 (2002) (citations omitted).

We have previously recognized that "[t]he added difficulty in maintaining the parental relationship is not unique" but "common to all parents whose children live some distance away." Scinaldi, 2 Va. App. at 574, 347 S.E.2d at 151.  Thus, such circumstance "should not be the sole basis for restricting a custodial parent's residence except where the benefits of the relationship cannot be substantially maintained if the child is moved away from the non-custodial parent."  Id. (emphasis added).  The "beneficial relationship between the child and [parent]" must not be "placed at risk" to disadvantage the child.  Bostick, 23 Va. App. at 534, 478 S.E.2d at 322.

"In reaching a decision on the 'best interests of the child,' the court is guided by Code § 20-124.3," which specifies a myriad of factors appropriate to the issues of custody and visitation.  Cloutier v. Queen, 35 Va. App. 413, 427, 545 S.E.2d 574, 581 (2001).  However, "[a]s long as the trial court examines the factors, it is not 'required to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors.'"  Sargent v. Sargent, 20 Va. App. 694, 702, 460 S.E.2d 596, 599 (1995) (citation omitted).  The trial court's determination of the child's best

-

interests "is a matter of discretion . . . , and, unless plainly wrong or without evidence to support it, the court's decree must be affirmed."  Bostick, 23 Va. App. at 533, 478 S.E.2d at 322.

Here, although mother enjoys physical custody and care of Kylie, father, an exceptionally committed and attentive non-custodial parent, has established and maintained an "attachment" or "bond" with Kylie, which has demonstrably benefited the child.  The value of such relationship was recognized and enhanced by the trial court through expanded visitation between the two within months of the instant proceedings, clearly promoting the child's interests.

Accordingly, the expert witnesses agreed that more frequent visitation between father and Kylie was preferable to reduced contacts, albeit for longer periods of time.  While Dr. Hawley suggested father might compensate for the loss of "face-to-face contact" with Kylie through technological "adaptation," he acknowledged such options are "not as optimal as personal contact."  Similarly, Dr. Zuckerman testified "phone contact" and "video cameras" may "make a positive contribution" to the father-daughter relationship, but are "not quite the same" and do not "take the place of . . . having somebody . . . feed you," "hold you," "put you to bed," "play with you," and "make faces at you."

Significantly, the proposed relocation was prompted solely by mother's marriage to Jones and his desire to pursue

-

employment and residence in South Carolina to be nearer his child by a prior marriage, not the unavailability of like economic opportunity in northern Virginia.  Similarly, mother's decision to remain unemployed and "stay-at-home" with Kylie is not precluded by continued residency in Virginia.  Thus, both mother and Jones indicated that the relocation plans would yield to an adverse decision by the trial court, thereby preserving the status quo.

Accordingly, the evidence clearly established that the proposed relocation reflected the preferences of mother and Jones, not necessitous or other compelling circumstances.  While advantages accruing to a custodial parent from relocation oftentimes inure to the benefit of a child and merit consideration by the court, such advantages must be weighed against any deleterious effects, including an adverse impact upon the relationship between the child and non-custodial parent.  The instant record demonstrates few, if any, benefits to Kylie, a very young child, from relocation hundreds of miles from her father.  To the contrary, the evidence clearly establishes that the move would disrupt the positive involvement and influence of father in Kylie's life, a result at odds with her best interests.  Thus, under the circumstances of this case, the decision to disturb the "status quo" was plainly wrong and unsupported by the evidence.

### III.  ATTORNEY FEES

Both parties requested an award of those costs and attorneys' fees incident to appeal.  See O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996). Upon a review of the record, we find the litigation addressed appropriate and substantial issues and neither mother nor father generated unnecessary delay or expense in pursuit of their respective interests.  We, therefore, deny each award of attorney's fees from the other.

Accordingly, we reverse the trial court and remand for further proceedings consistent with this opinion.

Reversed and remanded.