## CIRCUIT COURT OF ROANOKE COUNTY

Nina Mohammed

v.

Eric Williams

Case No. CH03-691

BY JUDGE ROBERT P. DOHERTY, JR.

March 24, 2005

The evidence in this custody case has been presented throughout many hours of testimony, in six separate hearings, over nine months. At the start of the hearings the three children, all boys, were ages 10, 7, and 2. The youngest child is developmentally delayed and is a "special needs" child. The other two children appear to be both mentally and physically gifted. Mother and Father are physicians. Father specializes in cardiology and Mother in obstetrics and gynecology.

After Mother and Father completed their medical education and training, they moved with their two sons to Roanoke, Virginia, where both parents obtained employment in their respective fields of medicine. In August of 2001, their youngest son was born. About that time, Mother changed her employment to a part time schedule so that she could spend more time caring for the children. On December 27, 2002, Father moved out of their house and into an apartment. For the next approximate eighteen months, despite the fact that Mother filed suit for divorce in November 2003, Father continued to return to the marital home almost daily to see the children and to have meals with them. In June 2004, Mother took all three children and moved to her hometown of Tenafly, New Jersey. The Court made no custody determination

prior to her move. She obtained employment at a local hospital in Northern New Jersey but recently changed jobs so that she would have more time to spend with the children. Father continues to be employed in Roanoke. He travels to New Jersey on alternate weekends, usually by plane, where he rents a motel room and visits with the children. He also talks to the children by cell phone numerous times each day and communicates with them by e-mail.

Both Mother and Father are requesting custody of all three children. In the alternative, Father has asked that Mother be required to return to the Roanoke Valley with the children so that he can see them more frequently and be more active in their daily lives. For the reasons set forth herein, the Court finds in favor of the Mother.

### Custody; Relocation

Although Mother relocated with her three children from Virginia to New Jersey during the pendency of her divorce case, this is not a true relocation case in the same sense as are *Sullivan v. Knick*, 38 Va. App. 773, 568 S.E.2d 430 (2002), and *Sullivan v. Jones*, 42 Va. App. 794, 595 S.E.2d 36 (2004). Those cases stand for the proposition that, once the Court makes an initial custody determination, relocation will not be allowed unless changed circumstances exist and unless the relocation or move to another state is shown to be in the best interest of the children. In this case, an original custody decision has yet to be made. The fact that Mother has relocated with the children to another state is simply one of the factors under § 20-124.3, Code of Virginia (1950), as amended, which the Court must consider in determining custody. The actual issue before the Court at this time is whether it is in the best interest of the children to place their custody with their Mother or with their Father. *Petry v. Petry*, 41 Va. App. 782, 790, 589 S.E.2d 458 (2003). In reaching the custody decision in this case, the Court has considered all of the factors set forth in Va. Code § 20-124.3.

Each party has testified concerning the same or similar incidents in the lives of their children and in their own lives. And yet individually, each has seen these events differently. There is no question that both believe that what they are saying is true. Needless to say, their perceptions differ. Conflicts in the evidence exist. The Court, having had the advantage of observing the parties and their reactions over many hours of testimony and in some very stressful moments, resolves the majority of those conflicts in favor of the Mother.

The Father is devoted to his children and spends all of the time with them that the Court allows. He has traveled to New Jersey every other

weekend for approximately six months to visit them. He is in constant contact with them by telephone, attends as many of their school and sports functions as he can, and he encourages them in their physical and educational endeavors. When they resided in the Roanoke Valley, he attended all of their games and practices, coached some of their sports teams, visited the children for lunch at their school, and on at least one occasion, prepared and presented a health and medical lesson to their class. As the primary breadwinner, in a very demanding profession, he was unable to spend as much time with the children as did their mother. After the separation of the parties, Father continued, or attempted to continue, to return to the former marital residence each evening to eat and play with the children. During his visits with the children in New Jersey, the Father has shown that he is attentive to the special needs of the youngest child, and he includes him in many of the activities with his other two sons. Although no child support arrangements have been made, Father spends a great deal of his income on visits with the children. He makes a monthly payment on the vacant former marital residence and refuses to sell it, in the hope that it will be available as a home for him and his children if he is successful in this custody case. He has made arrangements for the two oldest boys to be re-enrolled in the private school they previously attended in the Roanoke Valley, and he has arranged for them to attend summertime sports camps. The Father is an extremely capable person. He has made carefully thought out plans and schedules that look forward to a time when he hopes to be able to provide all of the children's daily care. The Court believes his testimony that, if he is granted custody, he will arrange for a full time nanny to care for the children while he works and that he will provide for their remaining care himself.

The Mother has been the primary care giver for the children throughout their entire lives. They rely on her constant presence. She has always taken care of their daily needs. She has placed the welfare of her children before her career, having gone to a part time status when the youngest child was born, not working at all for a number of months during her transition to New Jersey, and most recently changing jobs so that she would have more time to spend with the children. While in the Roanoke Valley, Mother took the children to all of their medical appointments and arranged for and monitored the special therapy needed by their youngest child. Although that child did well with the limited therapy he was receiving in Virginia, he is doing much better now with the greatly expanded physical, occupational, and educational therapy provided through his New Jersey schooling.

Insofar as the relocation by Mother with the children to her home town of Tenafly, New Jersey, is concerned, the Court recognizes that Mother

unilaterally made that decision so that she would be closer to friends and family who could provide assistance to her in caring for the children, assistance she was not getting from Father in Roanoke. She made that decision after the Father moved out of the home where she and the children resided. That is a decision that she made after trying to cope as a single parent for eighteen months, without the Father being in residence to assist her with the children. His daily appearance to eat and play with the children may have provided some benefit to the children and to himself, but it did not provide the necessary assistance Mother needed to raise three active boys. The move to New Jersey was made easier for the children by the fact that Mother had taken them there to visit their extended family almost every month, throughout their entire lives. That strong family support available to them in Northern New Jersey not only assisted their Mother with their care, but it enabled them to quickly adjust to their new home. They have made friends, joined local sports groups and are able to actively practice their Moslem faith at the nearby mosque. Their academic achievements are excellent. They have the advantage of frequent visits and contact with their Father, and it appears as though his interaction with the children covers a broader area than it did when the emphasis was chiefly on their sports activities in Virginia. Because of her ability to rely on her family's assistance with child care, their mother is employed on a full time basis. The income she earns should assist with child support to the extent that the Father should be able to continue to afford frequent trips to visit the children. The relocation to Northern New Jersey is definitely in the best interest of the children. They are settled in their new home and they are thriving. The advantages provided to them by living in a community surrounded by family members they have known their whole lives and in whom they and their mother can rely upon in all aspects of their social, emotional, and religious life, provide a stable, warm, and loving environment most single parent families never achieve.

Mother has encouraged the children's contact and continuing relationship with their father, despite the fact that the Father tends to ignore her and communicates with her chiefly through the children. Mother has asked that the Father not call the children on their cell phone when they are trying to get ready for school in the morning, but instead of cooperating, Father continues this practice, viewing Mother's request as an attempt to limit his access and his rights to his children. Currently, Father talks to the children four to twelve times daily on the cell phone. Their Mother provides the cell phone for them and has established an e-mail address for the children so they can use it to further communicate with their Father. The Court believes, based on the manner of the Father's testimony concerning his contact with the

children, based upon his attitude towards the Mother, and based upon his refusal to discuss visitation and related matters dealing with the children directly with the Mother, that he would curtail, rather than encourage, the children's contact and relationship with the Mother if the children lived with him. This, despite the fact that, after a problem occurred early in these proceedings, the Court very precisely advised both parties that failure to communicate with each other directly and failure to cooperate with each other concerning their children, could be a major factor in their case and might even be the single most important factor in making a custody decision.

The Court believes that Father was aware of Mother's stated plans to relocate with the children to her home town in Northern New Jersey. He may not have actually believed that she would really move, and he may not have specifically said that he consented to the move, but he did nothing to prevent it. He discussed the move with Mother and her relatives. Both Mother and Father discussed it with the children. Father signed the enrollment forms for the children to attend school in New Jersey. Their last report cards from their Roanoke Valley school made reference to the fact that the children were moving out of state and would attend a new school the following year. The children's doctor testified that Father discussed with him the children's pending move. Furniture was divided, the house was put on the market for sale, and Father drew up a budget or list of expenses which included the cost of frequent trips to Tenafly, New Jersey, to visit the children. It is obvious that Mother believed that Father either consented to the move, or in the alternative, that he would not contest her decision to move with the children.

Finally the insightful report of the Guardian ad litem has been extremely helpful. Her findings of fact are consistent with those of the Court. To the extent that they have not been restated in this letter opinion, they are hereby incorporated by reference and adopted. The Court concurs with her conclusion as to custody, and, finding it to be in the best interest of the children, grants joint legal custody to both Mother and Father, with primary physical custody granted to Mother. The parties should be able to agree on most of the issues facing them on the visitation question. To that end, the Court suggests that the parties consider alternate weekend visitation as they have been doing, some sort of equal division of the school and religious holidays celebrated by the parties, and an equal division of the summer vacation time. If they are unable to agree, the visitation issue should be set for a hearing. The fees of the Guardian ad litem, which the Court approves, will be divided equally between the parties and paid forthwith.

April 22, 2005

The parties, after presenting some of their evidence in the equitable distribution portion of their divorce case, asked the Court to classify the Husband's interest in his medical business so that they could determine whether it was necessary to hire experts to value that business.

Physician Husband states that he had a job offer from a local group of physicians but that he could not initially go to work for them because he had a non-compete agreement with his employer. The terms of that agreement were that, upon termination of his employment, he could not practice cardiology within fifty miles for an eighteen-month time period. The cost of the buyout of the non-compete agreement was $125,000.00. Husband paid one-half of that purchase price with funds borrowed against the marital residence. The other half was to be paid by the execution of a note held by that employer to be repaid by Husband's use of that employer's hospital for a five-year term whenever his new practice required him to perform procedures in a hospital setting. Husband also pledged marital collateral to secure the note and to guarantee his compliance with this agreement. One-sixtieth of that note was and is forgiven, and one sixtieth of the collateral was and is returned each month that Husband complies with the agreement to use his former employer's hospital for his surgical procedures.

Immediately after the buy-out, Husband went to work for the local cardiology group. He was told that, in order to be considered eligible to purchase an interest in that business, he would have to work for them as an employee for two years. This was to allow his future business co-owners the opportunity to observe and approve of his joining their business as an owner. Husband and Wife separated ten months after the buy-out of the non-compete agreement. Fourteen months after their separation, Husband bought an interest in the cardiology group. He contends that he purchased his interest in the business after the separation of the parties, using only funds he borrowed or earned after separation and, therefore, his entire interest in the business should be classified as his separate property.

Wife, who is also a physician, argues that the Husband used marital funds and marital efforts to buy out of his non-compete agreement so that he could go to work for, and purchase an interest in, his current business. She reasons that a condition precedent to the Husband's purchase of his interest in the business was the requirement that he work for the business for two years. It was during that two-year period while working as an employee for his current medical business, but before he actually purchased an interest in it, that the parties separated. Wife points out that, but for the buy-out of his non-

compete agreement, he would not have been able to work for his current employer and, thus, would not have been able to purchase an interest in his current business. Therefore, according to the Wife's theory, the marital funds and efforts used to buy out the non-compete agreement, as well as the time spent working for his new employer prior to the separation of the parties, were so necessarily intertwined with the purchase of Husband's current business that the entire transaction should be treated as if marital funds were actually used in that purchase.

The Court finds that the interest in the medical business that the Husband purchased after the separation of the parties is his separate property. The Court also finds that the right to compete against his former employer is a valuable contract right that was purchased, at least partially, prior to the separation of the parties. It is hybrid property, the value of which is subject to division in the equitable distribution proceeding.

## Separate Property

The concepts of separate property and marital property have been around since the inception of our equitable distribution laws and do not need a great deal of explanation. For purposes of classifying property, the separation of the parties is treated as the event that ends the marital partnership between husband and wife. Property acquired by one of the parties after the marital partnership has been severed is not marital property. It is separate property. See § 20-107.3, Code of Virginia (1950), as amended and *Dietz v. Dietz*, 17 Va. App. 203, 210 (1993).

In this case, neither party claims that the purchase price charged by the medical business in which the Husband bought an interest included the cost of the buy out of Husband's non-compete agreement with his former employer. Also, neither party challenges the fact that the money the Husband paid his new employer to purchase a portion of the business all came from after-separation-earned income and after-separation-borrowed funds. Wife simply argues that necessary conditions precedent to that acquisition were made with marital effort and money and, therefore, the Husband's interest in his medical practice should be treated as hybrid property.

The problem with the Wife's argument is that it does violence to the statutory concept of separate property. Too many compromises in logic have to be made in order to reach the conclusion argued by her. If all that was needed to create a marital interest in property was to find some condition precedent to its acquisition that was obtained by marital efforts, then property acquired years after a divorce could still be declared to be marital. That line of

logic, taken to its logical extreme, becomes untenable. However, no compromise in logic nor alteration of facts have to be made to find that the entire interest in the Husband's medical practice is his separate property, purchased entirely by him from after-separation-borrowed and earned funds. Accordingly, the Court finds the Husband's interest in his medical practice to be his separate property, not subject to equitable distribution.

## Hybrid Property

Although not successful in classifying the Husband's medical practice as hybrid property, the Wife's argument has identified an asset that has some of the attributes of marital property and some of the attributes of separate property. That is the personal contract right that allowed the Husband to compete against his former employer. It is a species of property and an asset that has value. *Campbell v. Corpening*, 230 Va. 45, 49 (1985). It fits the definition of hybrid property in that it was purchased in part with marital funds and effort and in part with separate funds and effort. Va. Code § 20-107.3(A)(3) and *Fowlkes v. Fowlkes*, 42 Va. App. 1, 10 (2003). Accordingly, the Court finds that the contract right to compete against Husband's former employer is hybrid property.