Richard F. CODY, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant/Third Party
Plaintiff,

v.

Jerome P. Friedlander II, et al.,
Third Party Defendants.

No. 1:04CV171.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 13, 2004.

Roger J. McClure, Alexandria, VA, for Plaintiffs.

## MEMORANDUM OPINION

ELLIS, District Judge.

This suit concerns the validity of a federal tax lien. The central question presented is whether plaintiffs, who claim to own the liened townhouse property, are merely the nominee owners on behalf of the third-party defendant taxpayers, who live in the townhouse, are relatives of plaintiffs, and whose tax liability is the basis for the lien.

Plaintiffs commenced this declaratory judgment action against the United States in February 2004 seeking to invalidate a federal tax lien on a townhouse. The defendant United States responded by claiming that plaintiffs were mere nominee owners of the property and additionally filed (i) a counterclaim against plaintiffs to set aside certain transfers of assets, and (ii) a third-party claim against the taxpayers to reduce the taxpayers' income tax deficiency assessments to judgment and to foreclose on the lien. Following a one-day bench trial on October 28, 2004, the parties filed supplemental briefs and presented oral argument. As the matter has now

been fully briefed and argued, it is ripe for resolution. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

### I. The Parties

1. Taxpayers and third-party defendants Jerome P. Friedlander II and Irene B. Friedlander, husband and wife, have experienced financial difficulties since the late 1980s and have been insolvent since 1995. While they have not filed for bankruptcy, their insolvency has precluded them from paying the full amount of their income taxes for any year from 1996 until 2001. Since 1999, the Friedlanders have lived in a townhouse at 7439 Hallcrest Drive, McLean, Virginia, the deed to which indicates that it is owned by their relatives, Richard and Janet Cody. While living there, the Friedlanders have made all the mortgage payments, paid all expenses attendant to the maintenance of the townhouse, and treated the mortgage interest paid as a deduction on their federal income taxes.

2. Plaintiffs Richard Cody, his wife Janet Cody, and her father Herbert Bluethenthal are relatives of the Friedlanders. Irene Friedlander and Janet Cody are sisters and the daughters of Bluethenthal. In 1999, the Codys and Bluethenthal sought to assist the insolvent and financially troubled Friedlanders by devising a plan for acquiring a townhouse located at 7439 Hallcrest Drive, McLean, Virginia to serve as the Friedlanders' home. It is this transaction, more fully described in Part II *infra*, that is at the heart of this case.

3. The United States ("the government"), defendant and third-party plaintiff, has assessed federal income tax deficiencies against the Friedlanders for the years 1996–2001 totaling $199,118, including penalties and interest, as of July 12, 2004, and therefore claims a lien against all of the taxpayers' real and personal property to that extent. Based on the circumstances of the 1999 purchase of the townhouse at 7439 Hallcrest Drive, and on the Friedlanders' and Codys' subsequent conduct with respect to the property, the government contends that the Codys hold title to the townhouse as the Friedlanders' nominees, and therefore that its lien attaches to the townhouse and also to $24,000 in refinancing proceeds that the Codys received in February 2002.

### II. The Purchase of the Townhouse

4. In 1995, the Friedlanders defaulted on the mortgage on their Arlington, Virginia residence and were compelled to quit the premises. Because the Friedlanders' troubled financial circumstances made it difficult for them to rent or buy a home on their own credit, the Codys came to the Friedlanders' aid by co-signing a residential lease for them on a house in Arlington.

5. In 1999, the Friedlanders' residential lease on the Arlington house was due to expire and hence they began the search for a new place to live. Because their financial circumstances had not improved, the Friedlanders discussed with the Codys the possibility of the Codys again co-signing a residential lease. Over the course of several discussions, the Codys suggested to the Friedlanders that it might be preferable for the Codys to buy a house and lease it to the Fried-

landers rather than co-sign another residential lease. Richard Cody further suggested to Jerome Friedlander that under such an arrangement, the Friedlanders could simply make the mortgage payments directly to the lender instead of paying rent to the Codys. Jerome Friedlander, an experienced attorney, then suggested that the contemplated arrangement take the form of a land trust rather than a lease. Friedlander explained to Cody that through a land trust, the Friedlanders could be granted a beneficial interest in the property and thereby be permitted to treat the mortgage interest as a deduction on their federal income tax returns.[1]

6. At the same time or shortly thereafter, the Friedlanders discovered the townhouse located 7439 Hallcrest Drive, McLean, Virginia, their current home. Herbert Bluethenthal, meanwhile, was brought into the Codys and Friedlanders' discussions regarding the proposed purchase and land trust, and the following plan was devised: First, the Codys would apply for a mortgage on the McLean townhouse, purchase the property in their own names, and then settle it in a land trust. Bluethenthal, for his part, would contribute $50,000 as a down payment. The Friedlanders would then live in the townhouse, paying the mortgage, taxes, insurance and all other expenses and carrying costs.

The beneficial interests in the property were to be allocated as follows: Bluethenthal would receive a 19% beneficial interest in the trust property, the Codys an 80% share, and the Friedlanders 1%.

7. At trial, Jerome Friedlander and Richard Cody testified that the allocation of beneficial interests was determined as follows. Given that the townhouse's purchase price was $267,500, Bluethenthal's 19% share of the trust was intended to reflect his $50,000 down payment contribution, which amount is roughly that percentage of the purchase price. The Codys' 80% share was intended to reflect the financial risk they would incur by assuming personal liability for the mortgage. Lastly, the Friedlanders' interest was fixed at 1% because that was all that was required to permit them to deduct mortgage interest from their annual income for federal income tax purposes. In the course of his testimony, Jerome Friedlander admitted, however, that part of the motivation for assuming the minimum interest necessary for tax purposes was the desire to minimize the portion of the trust property subject to a federal tax lien in the event that the government were later to levy on his assets.[2]

8. Pursuant to the plan, the Codys entered into a contract to purchase the townhouse in May 1999. They paid

---

1. The Internal Revenue Code permits a person paying a mortgage to deduct the interest on that mortgage from his annual income provided that he possesses an interest in the property mortgaged. *See* 26 U.S.C. § 163(h)(4)(D) (2004).

2. The transcript of Jerome Friedlander's testimony reflects the following exchange:

> Q: [W]hat I am asking is ... if part of the reason you selected one percent is that

> you thought under the law that would insure that the IRS would not be able to seize more than one percent of the property to satisfy any tax indebtedness you might have.
> A: I did not think they would be able to do that.
> Q: And that's why one percent seemed like a good idea to you?
> A: Yes, sir.

$445 in connection with their mortgage loan application. Around the same time, the Friedlanders paid $5,000 as a deposit on the purchase contract and $350 for an inspection of the townhouse.

9. Closing occurred on June 24, 1999, with the Codys taking title to the townhouse in their own names and assuming a $208,000 loan on the property secured with a first deed of trust. Bluethenthal, as agreed, made a $50,000 down payment, and the Friedlanders contributed an additional $8,164. The latter contribution was made possible by a $30,000 loan obtained by Jerome Friedlander and secured by a second deed of trust on the townhouse. The Friedlanders used the $21,800 remaining from this loan to pay personal debts.

10. Shortly thereafter, the Friedlanders moved into the townhouse and have since paid all expenses and carrying costs attendant to occupancy. For the period from closing until June 30, 2004, those expenses amounted to approximately $170,000. More specifically, the Friedlanders paid:

a. $119,000 in mortgage payments;
b. $28,000 in utilities;
c. $4,700 in homeowners' association fees;
d. $15,000 in real estate taxes;
e. $2,600 in insurance premiums;
f. $1,900 in maintenance expenses; and
g. $2,700 in equipment replacement expenses.

Additionally, Jerome Friedlander carries an insurance policy on his life for the purpose of paying off the mortgage on the townhouse in the event of his death.

11. In sum, the respective contributions of the Friedlanders, Codys, and Bluethenthal toward the purchase and upkeep of the townhouse at 7439 Hallcrest Drive are as follows:

a. the Friedlanders paid $5,000 as deposit, $350 for a home inspection, $8,164 at closing, and $170,000 in mortgage payments and other expenses, for a total contribution of approximately $183,500;

b. Bluethenthal paid $50,000 at closing; and

c. the Codys paid a $445 mortgage application fee.

12. During the five-year period from June 1999 to June 2004, the aggregate fair market rental value of the townhouse was $135,000. The Friedlanders, therefore, paid approximately $48,500 more toward the townhouse than they would have paid under a fair market rental arrangement for the same period.

## III. The 7439 Hallcrest Trust

13. Approximately three months after closing on the townhouse, the Codys, as planned, settled the townhouse in a land trust by conveying title to the townhouse to themselves as co-trustees of the "7439 Hallcrest Trust" ("the Trust"). The instrument creating the Trust had been prepared several months earlier by Jerome Friedlander, an experienced attorney, using the Illinois land trust as a model.[3] Under the terms of the Trust:

---

**3.** An Illinois land trust is a form of real property trust in which the trustee holds both legal and equitable title to the trust property and the beneficiaries possess interests in personal property, not real property. Unlike most trusts, the Illinois land trust in most circumstances is immune to the doctrine of merger, *i.e.*, the consolidation of legal and equitable

a. The Codys are both settlors and trustees of the Trust. In those capacities, the Codys have "the express and total power to revoke or amend [the][T]rust," and also the powers "to sell, mortgage, exchange, contribute, or transfer any [T]rust property" and "to manage the property in the absence of direction by the Beneficiaries."

b. There are two classes of Trust beneficiaries. In the first class are the Codys and Bluethenthal, with beneficial interests of 80% and 19%, respectively, as previously agreed.[4] In the second class are the Friedlanders, with a beneficial interest of 1%.

c. The Friedlanders, as "Class Two Beneficiaries," have (i) the exclusive right to occupy the property of the Trust, provided that they pay all expenses and carrying costs, and (ii) the right "to purchase the Trust assets at such price as the Beneficiaries may agree upon or, in the absence of any agreement as to the purchase price, at the same price as paid for the property." Additionally, as Class Two Beneficiaries, the Friedlanders are also the "Managing Beneficiaries," in which capacity they have the powers:

1. "to direct the Trustee to sell, pledge, invest, mortgage, exchange, distribute, lease, or deed with Trust property in any manner";

2. "to manage the operation of the Property," including "collection of rents, entering into leases, construction, reconstruction, payments of debts, insure, filing of eviction or collection lawsuits, receipt of mortgage or loan proceeds, or any other matter incidental to the management of the Property";

3. to determine "when and the amounts of such distributions to distribute income or gains of the Trust to the Beneficiaries";

4. "to enter into contracts for any purpose regarding Trust property"; and

5. "to maintain and participate in any proceeding before a court or administrative agency without participation of the Trustee," for such matters as "ejection or eviction of tenants, rental rates, zoning, housing codes or regulations, sales, conversions, exchanges, or loans."

14. The deed conveying the townhouse to the Codys as trustees of the Trust was recorded in the Fairfax County land records in October 1999.

## IV. The Reconveyance of the Townhouse and the Refinancing of the Mortgage

15. Approximately two and one-half years later, the Codys and Friedlanders decided to refinance the townhouse to take advantage of then-available lower mortgage interest rates. To this end, the Codys exercised their powers under the Trust and re-conveyed title to the townhouse to themselves in February 2002 because their prospective mortgage lender, Wells Fargo Home Mortgage, Inc. ("Wells Fargo"), would not refinance the existing mortgages while title to the townhouse was held in trust. The

---

title in the same person, and is characterized by a very limited role for the trustee. *See* 76 AM. JUR. 2D *Trusts* § 12 (1992).

**4.** Actually, the "Herbert Bluethenthal Jr. Living Trust," rather than Bluethenthal himself, was named by the Trust as the beneficial owner of the 19% interest in the Trust.

refinancing was completed that same month. Both existing deeds of trust, the $208,000 first deed of trust and the $30,000 second deed of trust, were paid off and replaced with a new single deed of trust for $263,000. Additionally, the Codys received $24,000 in refinancing proceeds.

16. The deed re-conveying title to the townhouse from the Trust to the Codys was properly recorded in the Fairfax County land records contemporaneously with the refinancing. Since then, title to the townhouse has remained in the Codys' name. The Friedlanders, however, have continued to treat mortgage interest payments as deductions on their federal income tax returns despite the fact that the deed to the townhouse no longer reflects any ownership interest on their part. At trial, Jerome Friedlander explained this incongruity as a matter of absentmindedness on his part: He had intended to see that the townhouse was re-settled in the Trust, but simply forgot to do the necessary paperwork.[5] Meanwhile, Friedlander explained, both he and his family members continued to regard the townhouse as held in trust. Richard Cody similarly testified that he understood himself to hold title to the townhouse as a trustee under the terms of the Trust that had existed prior to the refinancing.

## V. Procedural History

17. In March 2003, as part of an ongoing effort to collect the Friedlanders' unpaid federal income taxes, the government filed a Notice of Federal Tax Lien against "Richard F. Cody and Janet Cody, as co-trustees, under the 7439 Hallcrest Trust, as nominee of Jerome P. Friedlander and Irene B. Friedlander" with the Clerk of the Circuit Court for Fairfax County, Virginia, where the townhouse is located.

18. In February 2004, after unsuccessfully attempting to void the lien through administrative appeals with the Internal Revenue Service, the Codys and Bluethenthal filed this action against the government for a declaratory judgment invalidating the lien on the townhouse.

19. In May 2004, the government filed a counterclaim against the Codys and a third-party claim against the Friedlanders.[6]

20. Although pled in a single count, the government's counterclaim against the Codys alleges multiple causes of action to set aside fraudulent conveyances. First, the government alleges that the February 2002 transfer of title from the Trust to the Codys should be set aside as fraudulent or constructively fraudulent. Second, the government alleges that the February 2002 refinancing payment of

---

5. The transcript of Jerome Friedlander's testimony reflects the following exchange:

> Q: And was a deed drawn, then, back from the Codys to the trust?
> A: No.
> Q: Was that the intention of the parties?
> A: No, just— I'm supposed. I just forgot to do it.

It appears that the responsibility for ensuring that the townhouse was re-settled in the Trust fell to Jerome Friedlander because of his familiarity with such matters as an attorney specializing, *inter alia*, in real estate law.

6. The government's third-party claim also named Wells Fargo, the mortgagee of the townhouse property, as a third-party defendant. The government subsequently conceded that even if the tax lien were upheld, Wells Fargo's lien rights would be superior, and, accordingly, Wells Fargo was voluntarily dismissed.

$24,000 to the Codys should be set aside as fraudulent or constructively fraudulent. Third, and alternatively, the government alleges that the Friedlanders' payments toward the purchase and maintenance of the townhouse should be set aside as fraudulent or constructively fraudulent to the extent that they exceed the fair market rental value of the townhouse.

21. The government's third-party claim against the Friedlanders seeks to reduce the Friedlanders' federal income tax deficiencies for the years 1996–2001 to judgment. The government also seeks to foreclose its tax lien against the townhouse and the refinancing proceeds paid to the Codys, or, at the very least, the Friedlanders' interests therein. Alternatively, the government seeks to foreclose its tax lien against the Friedlanders' payments in connection with the purchase and maintenance of the townhouse to the extent that those payments are fraudulent transfers.

22. On October 28, 2004, a one-day bench trial was held at which various documents were admitted into the record and Richard Cody, Jerome Friedlander, and Morris Levy, the Friedlanders' accountant, testified. Following the trial, the parties submitted briefs and presented oral argument, *inter alia*, on the questions (i) whether the government had established a valid nominee tax lien against the Codys, and (ii) the amount of that lien. The matter was thereafter taken under advisement.

## VI. The Amount of the Lien

23. At the outset of this litigation, the government claimed a total federal income tax deficiency for 1996–2001 of $201,297, including penalties and interest, as of March 18, 2003.

24. In October 2004, a few weeks before the trial of this action, the Friedlanders filed amended tax returns for 1996 and 1999 in an attempt to reduce the government's deficiency assessments for those years. In pre-trial memoranda, the government disputed the Friedlanders' tax treatment of certain events as set forth in the amended returns. At the time of trial, therefore, only the Friedlanders' income taxes for 1996 and 1999 were in dispute.

25. At trial, the following facts were adduced with respect to the Friedlanders' tax liability for 1996 and 1999. When the Friedlanders defaulted on their home mortgage payments in 1995, they were indebted to C.W. Cobb & Associates ("Cobb"), their home mortgage lender, for $828,000. In addition to the home mortgage, this debt was cross-collateralized with the Friedlanders' one-third interest in an office building in Arlington, Virginia. The building was under the management of Friedlander, Friedlander & Brooks ("FF & B"), a real estate partnership in which the Friedlanders held a one-third interest. In 1996, Cobb sold the Friedlanders' former residence for $338,000 and took a deed in lieu of foreclosure valued at $290,000 on the Friedlanders' interest in the Arlington office building. Cobb then declared a $200,000 deficiency on the Friedlanders' debt, later reducing that deficiency to a judgment. Three years later in 1999, the office building itself was sold and FF & B was dissolved.

26. The Friedlanders' original 1996 federal income tax return reported the conveyance of the deed in lieu of foreclosure as the sale of a partner-

ship interest in FF & B. Given the deed's negotiated value of $290,000 and Jerome Friedlander's negative $60,000 basis in the partnership, the Friedlanders' tax return reflected a taxable gain of $350,000 from the conveyance of the deed. In 1998, the Friedlanders filed an amended 1996 tax return in which they recharacterized the conveyance of the deed as the sale of a real estate interest rather than a partnership interest. The amended return reflected a basis of $40,000 rather than negative $60,000, and, accordingly, a taxable gain to the Friedlanders of $250,000 rather than $350,000. The government accepted this recharacterized treatment and the ensuing reduction in tax liability. Because of this treatment, however, the Friedlanders were obligated to treat the 1999 dissolution of FF & B as a taxable event. Their 1999 tax returns, therefore, reflected a taxable gain of $170,000 from the dissolution of FF & B and the sale of its Arlington office building.

27. In October 2004, the Friedlanders further amended their 1996 and 1999 returns to reflect dramatic changes in the treatment accorded the 1996 conveyance of the deed to Cobb and the 1999 sale of FF & B's Arlington office building. First, citing the federal tax code provision allowing insolvent taxpayers to exclude the discharge of indebtedness from taxable income,[7] the Friedlanders recharacterized the 1996 conveyance to Cobb as debt forgiveness instead of a sale. With this change, the Friedlanders' second amended return for 1996 reflected no taxable gain from the conveyance and, accordingly, a taxable income for that year reduced by $250,000 (or, with respect to their original return, $350,000). Second, the Friedlanders characterized the difference between Cobb's proceeds from the 1999 sale of FF & B's Arlington office building ($360,000) and the 1996 value of the deed in lieu of foreclosure ($290,000) as a home mortgage interest payment to Cobb. This change reduced the taxable income reflected on the Friedlanders' previous 1999 return by $70,000.[8] These two reductions in taxable income were reflected in greatly reduced tax liabilities on the Friedlanders' October 2004 amended returns for 1996 and 1999.

28. In a post-trial memorandum, the Friedlanders appropriately abandoned their latest characterization of the 1996 conveyance of the deed to Cobb as debt forgiveness, and indicated that they wished to treat that conveyance as they had in their original 1996 tax return, *i.e.*, as the sale of a partnership interest in FF & B, contending that if their 1996 taxes reflect the sale of their entire interest in FF & B—rather than a mere real property interest, as on their first amended return—then their 1999 taxes should reflect no taxable gain from the dissolution of FF & B and the sale of its Arlington office building.

29. In response, the government filed a memorandum accepting this treatment for the events of 1996 and 1999, noting only that if the Friedlanders

---

7. *See* 26 U.S.C. § 108(a)(1)(B) (2004).

8. The Friedlanders' amended return for 1999 reflected two other changes as well: (i) a basis in FF & B of negative $60,000 instead of $190,000 as previously reported, and (ii) a

$250,000 reduction in taxable gain to account for gain realized in 1996 when the deed in lieu of foreclosure was given to Cobb. These two changes, however, resulted in approximately offsetting tax consequences.

are treated as having sold their entire interest in FF & B in 1996, their taxes for 1996 must be recast to account for a negative $60,000 basis in FF & B, and their taxes for 1997, 1998, and 1999 must be recast to exclude all deductions that reflect ownership of FF & B. After recalculating the Friedlanders' tax deficiencies for the years in question to account for these changes, the government submitted a revised total deficiency assessment for 1996–2001 of $199,118, including penalties and interest, as of July 12, 2004.

30. A necessary consequence of the Friedlanders' decision to treat their conveyance of the deed in lieu of foreclosure to Cobb in 1996 as the sale of their entire interest in FF & B rather than a mere real property interest is the recasting of their 1996 tax return to reflect a basis in FF & B of negative $60,000, as originally reported. The record convincingly reflects that when the Friedlanders' 1996 taxes are recast to account for that negative basis, their federal income tax deficiency for 1996 is $155,806.74, including penalties and interest, as of July 12, 2004.

31. A further consequence of the Friedlanders' decision to treat their interest in FF & B as having been sold in 1996 is the elimination of entries on later tax returns that reflect ownership of FF & B after 1996, including (i) a $4,400 rental loss deduction for FF & B for 1997; (ii) a $14,300 rental loss deduction for FF & B for 1998; (iii) the $70,000 deduction for mortgage interest paid to Cobb arising from the sale of FF & B in 1999; (iv) $30,000 for rental income from FF & B in 1999; and (v) $170,000 in taxable gain from the sale of FF & B in 1999. When the Friedlanders' taxes for 1997, 1998, and 1999 are recalculated to account for the elimination of these entries, the record convincingly reflects that their federal income tax deficiencies for 1997, 1998, and 1999 are $10,472.29, $11,674.14, and $5,157.53, respectively, including penalties and interest, as of July 12, 2004.

32. The record further reflects, and the parties do not dispute, that the Friedlanders' federal income tax deficiencies for 2000 and 2001 are $9070.38 and $6936.66, respectively, including penalties and interest, as of July 12, 2004.

33. Accordingly, the Friedlanders' total federal income tax deficiency for 1996–2001 as of July 12, 2004 is $199,117.74.

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

1. There is subject matter jurisdiction over plaintiff's complaint pursuant to 28 U.S.C. § 1346, which confers original jurisdiction for civil actions against the United States arising under federal law, and 28 U.S.C. § 2410, which states that the United States may be sued in any federal district court in a civil action to quiet title to real or personal property on which the United States claims a lien. There is likewise subject matter jurisdiction over the government's counterclaim and third-party claim pursuant to 28 U.S.C. § 1340 and 26 U.S.C. § 7402, which confer original jurisdiction for actions arising under the internal revenue laws, and 28 U.S.C. § 1345, which confers original jurisdiction for civil actions commenced by the federal government.

2. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C.

§ 1396, as the taxpayers reside in this district and their tax liability arose here.

## II. Ownership of the Townhouse

3. Logically antecedent to the question whether the title owner of the townhouse at 7439 Hallcrest Drive, McLean, Virginia is merely the nominee of Jerome and Irene Friedlander is the question of who the title owner is. Pointing to the fact that title to the townhouse was conveyed from the Trust to the Codys in February 2002 and has not since been reconveyed, the government contends that the Codys were the owners of record when the government's lien on the townhouse was filed in March 2003.[9] Plaintiffs, conversely, argue that title to the townhouse has remained in the Trust at all times relevant to this action because all members of plaintiffs' family intended that the property would be reconveyed to the Trust following completion of the refinancing, and, in addition, have always considered the property to be held in trust.

4. Virginia law recognizes three basic forms of trust, namely (i) express, (ii) resulting, and (iii) constructive trusts. *See In re Dameron,* 155 F.3d 718, 722 (4th Cir.1998); *Leonard v. Counts,* 221 Va. 582, 272 S.E.2d 190, 194–95 (1980). An express trust arises "when parties affirmatively manifest an intention that certain property be held in trust for the benefit of a third party." *Dameron,* 155 F.3d at 722; *accord Peal v. Luther,* 199 Va. 35, 97 S.E.2d 668, 669 (1957); 76 Am. Jur. 2D *Trusts* § 65 (1992). Resulting and constructive trusts, by comparison, do not depend on any manifestation of intent, but instead arise by operation of law in certain circumstances. *Leonard,* 272 S.E.2d at 194. A resulting trust arises "when one person pays for property, or assumes payment of all or part of the purchase money, but has title conveyed to another with no mention of a trust in the conveyance." *Id.* Constructive trusts, in turn, arise to prevent fraud or injustice. *Id.* at 195. Here, plaintiffs argue only for the existence of an express trust.[10]

5. Under Virginia law, an express trust may arise from "words or circumstances which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another ...." *Dameron,* 155 F.3d at 722 (internal quotations and citations omitted). No technical words or formula of words are required to create an express trust. *Id.; Broaddus v. Gresham,* 181 Va. 725, 26 S.E.2d 33, 35 (1943). Further, Virginia is one of a minority of American

---

9. Notably, the tax lien giving rise to this action was not filed against the Codys in their own names, but rather as trustees of the trust. Plaintiffs, however, have chosen not to challenge the validity of the lien on that basis. Accordingly, it is unnecessary to address the question whether the government's lien on the townhouse is asserted against the proper party.

10. Although plaintiffs do not argue for the existence of a resulting trust, it is worth noting that one would not arise in the circumstances of this case despite the fact that Bluethenthal paid $50,000 at closing while the Codys took title to the townhouse. When a parent makes full or partial payment for property but has title taken in a child's name, equity presumes that the parent intends to make a gift for the child, and a resulting trust does not arise. *See* 76 Am. Jur. 2D *Trusts* § 183 (1992); *Prange v. Prange,* 755 S.W.2d 581, 593 (Mo.App.1987); *Moore v. Moore,* 9 Ill.2d 556, 138 N.E.2d 562, 564 (1956).

jurisdictions that will enforce an express trust in real property where the trust declaration is not expressed in writing. *See Sterling v. Blackwelder,* 383 F.2d 282, 284 (4th Cir.1967); *Peal,* 97 S.E.2d at 669. Accordingly, neither the lack of an express declaration of trust, nor the lack of a writing evidencing the declaration is necessarily fatal to the creation of an express trust, provided that the circumstances otherwise unequivocally manifest that a trust is being created. Absent an express declaration of trust, however, only the actual transfer of property to a trustee can effect the requisite separation of legal and equitable interests necessary to create an express trust. *See Ballard v. McCoy,* 247 Va. 513, 443 S.E.2d 146, 148 (1994); 1 Austin W. Scott & William F. Fratcher, The Law of Trusts § 17 (4th ed.2001). Thus, either an express declaration of trust or a transfer of trust property to a trustee is required for an express trust to arise under Virginia law. Further, a settlor's mere intent to create a trust in the future, even if declared, does not suffice to create a trust; the settlor's words or acts "must constitute an actual carrying out and execution of the settlor's intent" for a trust to be created. 76 Am. Jur. 2D *Trusts* § 51 (1992); *see* 1 SCOTT & FRATCHER § 32.1.

6. The application of these principles to the case at bar compels the conclusion that no trust was created after the conveyance of title to the townhouse from the Trust to the Codys in February 2002. It follows, therefore, that the Codys have held title to the townhouse in their own names since then. This is so because the record reflects that the townhouse was not deeded back to the Trust following the February 2002 refinanc-ing, and that the Codys did not make an express declaration of trust during that time. Instead, the record convincingly reflects that the Codys intended that the townhouse would be re-settled in the Trust in the same manner that it was originally settled, that is, through the conveyance of a deed, but that no deed was ever executed to accomplish this and no new Trust document signed. In short, the Codys and Friedlanders' intent went unrealized. The fact that Richard Cody may nonetheless have believed, as he testified, that he held title to the townhouse as a trustee does not establish that a trust existed; it merely reflects Mr. Cody's mistaken and irrelevant opinion on a legal question. A different result would obtain, of course, had the Codys made some appropriate statement, in a letter or orally, to the effect that they held title to the townhouse as trustees under the terms of the former Trust. Such a statement might have had the same effect as the execution of a deed. *See Ballard,* 443 S.E.2d at 148; 1 SCOTT & FRATCHER § 17 ("A trust may be created not only by a transfer inter vivos or by will, but also by a declaration made by the owner of property that he holds it in trust."). That the record reflects no such statement is unsurprising, given the Codys' belief that the Trust was already in effect. In sum, the lack of an express manifestation of trust creation by the Codys, either through a declaration of trust or by the execution of a deed, compels the conclusion that no trust existed after February 2002, and therefore that the Codys have held title to the townhouse in their own names since then. The question then becomes whether they have held title

to the townhouse as the Friedlanders' nominees.

## III. Nominee Ownership of the Townhouse

7. Section 6321 of the Internal Revenue Code states that a lien on all of a taxpayer's "property and rights to property" arises in favor of the United States for neglect or refusal to pay federal income taxes. 26 U.S.C. § 6321 (2004). While it is well-established that a lien under § 6321 "cannot extend beyond the property interests held by the delinquent taxpayer," *United States v. Rodgers,* 461 U.S. 677, 690–91, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983), it is equally well-established that vesting formal title to a taxpayer's property in the taxpayer's alter ego or nominee will not place the property outside the reach of a § 6321 lien. *See G.M. Leasing Corp. v. United States,* 429 U.S. 338, 351, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) ("If petitioner was [taxpayer's] alter ego … [i]t would then follow that the [IRS] would be empowered … to levy upon assets held in petitioner's name in satisfaction of [taxpayer's] income tax liability."); *Shades Ridge Holding Co., Inc. v. United States,* 888 F.2d 725, 728 (1989) (upholding foreclosure of federal tax lien on property titled to taxpayer's nominee).

8. As is generally true of property rights in tax-enforcement disputes, the question whether property is held by a taxpayer's alter ego or nominee is determined by reference to state law. *Wolfe v. United States,* 798 F.2d 1241, 1244 n. 3 (9th Cir.1986); *Hill v. United States,* 844 F.Supp. 263, 270 (W.D.N.C.1993); *Towe Antique Ford Foundation v. IRS,* 791 F.Supp. 1450, 1454 (D.Mont.1992); *cf. Drye v.*

*United States,* 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 ("[w]e look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach"); *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960) (same); *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) (same). Here, however, as the government concedes and the Codys and Friedlanders do not dispute, Virginia law provides no guidance as to the proper standards for determining nominee ownership.

9. When faced with similar tax levy disputes, federal courts sitting in states whose law of nominee ownership is similarly undeveloped have typically looked to nominee ownership criteria employed in other federal tax collection cases. *See, e.g., LiButti v. United States,* 968 F.Supp. 71, 75 (N.D.N.Y.1997); *Hill,* 844 F.Supp. at 270–71; *Towe,* 791 F.Supp. at 1454; *but see United States v. Snyder,* 233 F.Supp.2d 293, 296 (D.Conn.2002) (refusing to apply nominee theory of ownership where not recognized under state law). As these courts have noted, moreover, federal and state standards for nominee ownership are generally so similar that the decision to look to federal or state law "is of little moment." *Shades Ridge,* 888 F.2d at 728. Accordingly, the factors applied in other federal tax collection cases are applicable here.

10. In cases in which the government asserts a nominee lien against property held by a natural person rather than a corporation or other impersonal entity, courts consider some or all of the following factors: (1) whether the taxpayer expended personal funds for the property; (2)

whether inadequate or no consideration was paid by the alleged nominee; (3) whether the property was placed in the alleged nominee's name in anticipation of a lawsuit or other liability; (4) whether the taxpayer enjoys the benefits of, retains possession of, and exercises dominion and control over the property; (5) whether a close family relationship exists between the taxpayer and the alleged nominee; (6) whether conveyances between the taxpayer and alleged nominee were recorded; and (7) whether the alleged nominee interferes with the taxpayer's use of the property. *See LiButti*, 968 F.Supp. at 76; *Simpson v. United States*, 89–1 U.S. Tax Cas. (CCH) P9285, 1989 WL 73212 (M.D.Fla. 1989); *Hill*, 844 F.Supp. at 271. The relatively few published decisions on nominee ownership in federal tax lien cases contain little, if any, elucidation on the underlying rationale for these factors. Yet, it seems clear from the nature of the factors that they are aimed at ferreting out the true ownership of the property and preventing taxpayers from disguising transactions in an effort to place their property beyond the reach of a tax lien.

11. These factors, applied here, point persuasively to the conclusion that the Codys own the townhouse as nominees of the Friedlanders. All but one of the seven factors points to this conclusion. To begin with the first and second factors, the record reflects that the Friedlanders have contributed over $180,000 toward the purchase and upkeep of the townhouse while the Codys paid a mere $445 for the mortgage application. Contrary to plaintiffs' contention, the fact that the Codys assumed personal liability for the mortgages on the townhouse does not affect the relative-contribution calculus. Given Bluethenthal's and the Friedlanders' down payments, the townhouse had an equity cushion in excess of $55,000 at the time of purchase. Coupled with the rising real estate market in Northern Virginia, this cushion, as a practical matter, largely eliminated the Codys' risk of financial loss. Accordingly, insofar as financial investment in a piece of property reflects beneficial interests therein, the vast disparity between the Friedlanders' and Codys' relative monetary contributions in the townhouse strongly indicates that the Friedlanders, not the Codys, are the real owners, and thus that the Codys are merely nominees of the Friedlanders.

12. With respect to the third factor, the record convincingly reflects that the purchase of the townhouse took the form that it did in order to place as much of the townhouse as possible beyond the reach of the Friedlanders' creditors, including the government, while reserving favorable mortgage interest tax treatment for the Friedlanders. It is pellucidly clear, for example, that Jerome Friedlander was well aware of his outstanding liabilities, including his federal tax debt, when the idea of using the Codys' credit and Bluethenthal's and the Friedlanders' money to purchase a house for the Friedlanders was first contemplated. And significantly, by Jerome Friedlander's own testimony, the decision to allocate to the Friedlanders a mere 1% interest in the Trust property—minuscule in comparison to their financial contributions—was motivated by the desire to minimize the portion of the townhouse that might be subject to a federal tax lien. Under the third nominee-ownership

factor, this attempt to disguise the Friedlanders' real beneficial interest in the property and thereby avoid liability points persuasively to the conclusion that the Codys are merely nominee owners.

13. The fourth factor points to the same conclusion. Since moving in, the Friedlanders have exercised complete dominion over the townhouse property and have behaved, for all practical purposes, as owners. Plainly, they have made the townhouse their home, spending thousands of dollars on upkeep and maintenance. Additionally, Jerome Friedlander maintains an insurance policy on his life for the purpose of paying off the mortgage on the townhouse in the event of his death. The Friedlanders' pre-closing behavior is similarly revealing of their degree of dominion and control over the townhouse: They paid a $5,000 deposit on the townhouse and then used the property as collateral for a $30,000 loan, the bulk of which they used to defray their own personal expenses and the remainder of which was used to increase the down payment on the townhouse. In sum, it is difficult to imagine a benefit of home ownership that the Friedlanders have not enjoyed since moving in to the townhouse.[11] Accordingly, the fourth factor strongly supports the conclusion that the Codys hold title to the townhouse as the Friedlanders' nominees.

14. Under the fifth factor, while it would probably be sufficient for the nominee-ownership analysis simply to note that Janet Cody and Irene Friedlander are sisters, both Richard Cody and Jerome Friedlander testified to the close relationship that exists between the Friedlanders, Codys, and Bluethenthal. The record reflects, in fact, that the purchase of the townhouse in 1999 was not the first time Codys had permitted the Friedlanders to use their credit to secure a place to live. In 1995, the Codys assisted the Friedlanders by co-signing a residential lease on a house that the Friedlanders sought to rent. The fifth factor, therefore, weighs strongly in favor of the conclusion that the Codys are merely nominee owners of the townhouse.

15. Alone among the nominee-ownership factors, the sixth factor favors the plaintiffs. Nonetheless, the fact that the conveyances of title between the Codys and the Trust were properly recorded counts for little in the overall analysis. This is especially so in light of the fact that Jerome Friedlander's failure to re-convey title to the townhouse to the Trust after the February 2002 refinancing arguably reflects the same lack of concern with formal property relationships and the formalities attendant thereto with which the sixth factor is ultimately concerned. Accordingly, while the

---

11. Although the Trust is no longer in effect, its terms help illustrate this point. For example, the Trust grants the Friedlanders, *inter alia,* the powers (i) to hire contractors or repairmen, (ii) to lease rooms to tenants or evict them, and (iii) to deal with local officials for municipal matters such as zoning, housing codes, and the like. In short, the Friedlanders' extensive powers under the Trust make clear that the Codys and Friedlanders intend-

ed that the Friedlanders would be essentially indistinguishable from fee simple owners for all of the typical matters attendant to home ownership. The fact that Jerome Friedlander modeled the Trust on an Illinois land trust reinforces this conclusion, as one salient feature of that type of trust is the minimization of the trustee's role in the oversight and management of trust property. *See* 76 Am. Jur. 2D *Trusts* § 12 (1992).

sixth factor counsels against the conclusion that the Codys are nominee owners of the townhouse, it is, in this context, essentially neutral.

16. With regard to the seventh factor, the record convincingly reflects that the Codys have not interfered in any way with the Friedlanders' use or enjoyment of the townhouse property. Thus, the seventh factor also points to the conclusion that the Codys are merely nominee owners.

17. In sum, the application of the factors to facts of this case leads inescapably to the conclusion that, in substance if not in form, the June 1999 purchase of the townhouse should be characterized as the Friedlanders' purchase of a home using the Codys' credit and their own and Bluethenthal's money. Just as they did in 1995 when they co-signed the Friedlanders' lease, the Codys merely permitted the Friedlanders to use their credit to find a place to live. Under these circumstances, for purposes of federal tax law the Codys are merely nominee owners of the townhouse, and the townhouse is therefore subject to the government's lien on the Friedlanders' assets.

18. Seeking to avoid this result, the Codys contend that if they had purchased the property and then established a bona-fide landlord-tenant relationship with their relatives—as they had originally planned to do—a nominee lien on the townhouse would not arise. From this premise, the Codys argue that the decision to arrange their rights with respect to the Friedlanders differently to take advantage of a provision in the tax code permitting the Friedlanders to deduct mortgage interest from their taxable income should also not give rise to a nominee lien. This argument founders on the fundamental principle of nominee ownership, namely that the substance of an arrangement, not the form, controls. Thus, while it is true that a bona-fide lease arrangement—complete with the payment of fair market rent and the observance of normal landlord-tenant formalities—between the Codys and the Friedlanders would not give rise to a claim of nominee ownership, this is not what occurred; there are significant substantive differences between the arrangement they created and a true lease arrangement, namely (i) the Friedlanders' roughly $8,000 down payment, (ii) their mortgage and maintenance payments on the townhouse in excess of fair market rental, (iii) their use of the townhouse as collateral for a personal loan, and (iv) their deduction of mortgage interest and real estate taxes from their taxable income, to name but a few. These differences trigger the law of nominee ownership, and are therefore fatal to the Codys' argument.

## IV. Remedies

19. For the foregoing reasons, plaintiffs' claim under § 2410 to invalidate the federal tax lien on the townhouse at 7439 Hallcrest Drive, McLean, Virginia fails. The lien, therefore, is valid and the government may proceed to foreclosure on the lien. Accordingly, judgment must be entered in favor of the United States directing that the property be sold.[12]

---

**12.** As previously stated, the government has conceded that Wells Fargo, the mortgagee, has first priority to the proceeds from the sale of the townhouse. The government's tax lien has second priority. Herbert Bluethenthal has no claim to proceeds from the sale of the

20. The United States also prevails on its claim to reduce the Friedlanders' tax deficiency assessments to judgment. Accordingly, judgment must be entered in favor of the United States against Jerome and Irene Friedlander in the amount of $199,117.74, including penalties and interest, as of July 12, 2004.

21. In light of the above, the government's counterclaim to set aside as fraudulent the conveyance of title to the townhouse from the Trust to the Codys in February 2002 must be denied as moot. Judgment is deferred, however, with respect to the government's counterclaim to set aside as fraudulent the February 2002 conveyance of $24,000 in refinancing proceeds to the Codys pending further briefing by the parties on the law of fraudulent conveyances.

townhouse because he has no deed of trust reflecting a security interest in the property, nor does he have an ownership interest in the townhouse given that the Trust no longer exists. No opinion is expressed here on whether Bluethenthal's $50,000 contribution is appropriately characterized as a gift or a loan to the Friedlanders.